[No. H032345. Sixth Dist. Jan. 22, 2010.]

JOHN DiQUISTO et al., Plaintiffs and Appellants, v.
COUNTY OF SANTA CLARA et al., Defendants and Respondents.

**COUNSEL**

Wylie, McBride, Platten & Renner, John McBride, Christopher E. Platten, Mark S. Renner; Clisham & Sortor, David P. Clisham; Law Offices of Donald T. Ramsey and Donald T. Ramsey for Plaintiffs and Appellants.

Ann Miller Ravel, County Counsel, Miguel Márquez, Acting County Counsel, Winifred Botha, Assistant County Counsel, Gregory J. Sebastinelli, Deputy County Counsel; Crowell & Moring, Ethan P. Schulman and Michael Y. Kao for Defendants and Respondents.

**OPINION**

**McADAMS, J.**—This litigation arose at the crossroads of public labor bargaining and the electoral initiative process. In early 2004, three unions

sponsored a local ballot initiative to mandate binding arbitration as a means of resolving labor disputes with their employer, Santa Clara County. The county opposed the initiative. During the same time period, the county engaged in labor negotiations with the unions, which included discussions aimed at their agreement not to support the initiative.

As taxpayers, plaintiffs sued the county, its board of supervisors, and two county officials, asserting that the county improperly spent public funds for partisan electoral purposes by bargaining for the unions' nonsupport of the initiative measure. Plaintiffs later added claims based on a supervisor's e-mail concerning the initiative. After extensive pretrial proceedings, the matter ended in a bench trial, with the court finding for defendants.

On appeal, plaintiffs renew their arguments that the county impermissibly used public funds for campaigning, both at the bargaining table and through the e-mail. On behalf of itself and the other defendants, the county defends the judgment against both arguments.

As we explain, the trial court's determinations are supported by the evidence and the law. We therefore affirm the judgment.

## INTRODUCTION: LEGAL BACKGROUND

To provide context for our discussion of the facts and the parties' contentions, we begin by briefly summarizing the legal principles at play here.

### Limits on the Expenditure of Public Funds

As the California Supreme Court recently reaffirmed, "in the absence of clear and unmistakable language specifically authorizing a public entity to expend public funds for campaign activities or materials, the entity lacks authority to make such expenditures." (*Vargas v. City of Salinas* (2009) 46 Cal.4th 1, 24 [92 Cal.Rptr.3d 286, 205 P.3d 207] (*Vargas*).) This limitation on the expenditure of public funds for campaigning has been recognized in a long line of California Supreme Court decisions, including the leading case of *Stanson v. Mott* (1976) 17 Cal.3d 206, 217 [130 Cal.Rptr. 697, 551 P.2d 1] (*Stanson*).

### The Relevant Public Employment Statute

Various statutes govern public employment. (*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1084–1086 [29 Cal.Rptr.3d 234, 112 P.3d 623] (*Coachella Valley*).) At issue here is the Meyers-Milias-Brown Act (MMBA), codified at

Government Code sections 3500–3511.[1] The MMBA "governs collective bargaining and employer-employee relations for most California local public entities, including cities, counties, and special districts." (*Coachella Valley*, at p. 1077.) It "requires public agencies to meet and confer in good faith with representatives of recognized employee organizations regarding wages, hours, and other terms and conditions of employment." (*County of Sonoma v. Superior Court* (2009) 173 Cal.App.4th 322, 329–330 [93 Cal.Rptr.3d 39], citing § 3505.) "If these meetings produce an agreement, the representatives of the parties must jointly prepare a written memorandum of understanding (MOU)." (*County of Sonoma*, at p. 330, citing § 3505.1.) The MOU (memorandum of understanding) must then be approved by the agency's governing body. (*County of Sonoma*, at p. 330.)

### Binding Interest Arbitration

■ "Interest arbitration involves an agreement between an employer and a union to submit disagreements about the proposed content of a new labor contract to an arbitrator or arbitration panel." (*City of Fresno v. People ex rel. Fresno Firefighters* (1999) 71 Cal.App.4th 82, 96 [83 Cal.Rptr.2d 603] (*Fresno*); see also, e.g., *County of Sonoma v. Superior Court, supra*, 173 Cal.App.4th at pp. 341–342.)

## FACTUAL BACKGROUND

The plaintiffs and appellants are John DiQuisto, Mildred Evans, and Rosemary Knox (collectively, plaintiffs). They are taxpayers and residents of the County of Santa Clara. The defendants and respondents are the County of Santa Clara, its board of supervisors, and two of its officials, chief administrative officer Peter Kutras, Jr., and chief labor negotiator Luke Leung (collectively, the County).

### The Ballot Initiative: Measure C

In early 2004, three Santa Clara County public sector labor unions agreed to sponsor a local initiative measure on the November 2004 ballot. The three sponsoring unions were the Registered Nurses Professional Association (RNPA), the Santa Clara County Correctional Peace Officers' Association (CPOA), and the Santa Clara Government Attorneys Association (GAA).

The initiative's purpose was to amend the county's charter by adding a provision for binding interest arbitration as a means of resolving labor disputes between the three sponsoring unions and the County.

---

[1] Further unspecified statutory references are to the Government Code.

On April 2, 2004, plaintiff Rosemary Knox, in her capacity as president of RNPA, filed a notice of intent to circulate a petition to qualify the measure for the ballot. The measure's proponents began gathering signatures three weeks later, on April 23, 2004.

On June 4, 2004, representatives of the three sponsoring unions met with county Supervisor Donald Gage, and with Kutras, Leung, and other county representatives, to discuss the initiative. The unions "discussed binding interest arbitration and . . . shared with [the County] that [the measure] would go forward" while "reaching out to see if there was some language that would be acceptable for both sides." No agreement was reached.

On June 23, 2004, the initiative qualified for the November ballot, identified as Measure C. On August 3, 2004, the county's board of supervisors adopted a resolution to submit Measure C to the voters.

The county opposed Measure C. Acting through its board of supervisors, the county placed two countermeasures on the ballot, identified as Measures A and B.

In October 2004, county Supervisor Blanca Alvarado directed the dissemination of an e-mail to approximately 1,500 individuals, encouraging the recipients to educate themselves about the three initiative measures and attaching a copy of a newspaper editorial urging a "no" vote on Measure C and a "yes" vote on Measures A and B.

In November 2004, Measure C was defeated at the polls, as were Measures A and B.

### Contract Negotiations

In 2003 and 2004, the County was engaged in contract negotiations with a number of its employee unions. The aim of the negotiations was to reach agreement with each union for a labor contract.

### Negotiations with the Deputy Sheriffs' Association

One of the unions negotiating with the County was the Deputy Sheriffs' Association of Santa Clara County (DSA). Those negotiations began in 2003; the then current contract was set to expire in 2004.

One of the "main goals" for the DSA in its negotiations was to secure the County's agreement to "benchmarking" with the San Jose Police Department. With benchmarking, DSA members "would just basically be piggybacked

with the San Jose Police Department, so whatever raise they would get [DSA] would subsequently get when [its] contract came due." Although the County seemed resistant to the idea of benchmarking at first, its position softened once the possibility of a longer contract was broached.

On April 1, 2004, the DSA and the County reached a tentative agreement, which included both pay raises and a benchmarking provision. After tentative agreement on those economic issues, the DSA offered the County a "side letter" stating that the DSA would not support the binding interest arbitration initiative. The side letter was "totally" the union negotiator's idea, who "freely" offered it to the County. The union negotiator was aware that the County was "hostile" to the arbitration initiative. The county negotiator was "a bit startled" at the offer but "essentially said, yeah, well, sure."

Both the DSA general membership and the County later ratified the agreement, including the side letter.

### Negotiations with the Correctional Peace Officers' Association

In the spring of 2004, the County was also negotiating with the CPOA. The CPOA's contract had expired years before, and the negotiations for a new contract had been underway for some time.

On March 29, 2004, a meeting took place that included county executives Kutras and Leung and CPOA officers Everett Fitzgerald and William Calabrese. As union president, "Fitzgerald wanted the County to enhance its economic offer." At that point, the CPOA was "demanding from the County a 30 percent wage increase over a period of a little over three years," while the County had offered a raise of 18 percent over five and a half years. Fitzgerald "was having difficulty with his rank and file" and he wanted the County "to put more money on the table." Fitzgerald "raised discussions about the binding interest arbitration measure, being asked whether CPOA was going to be in it or not." Fitzgerald indicated that "in order for [CPOA] to stay out of it [he had] to see more money." But according to Kutras, the County was not "going to put more money on the table." The following day, March 30, 2004, the CPOA joined the coalition supporting the arbitration initiative.

The County offered package proposals to the CPOA on April 7 and again on April 12. Both proposals offered raises much lower than the 30 percent requested by the CPOA, and both included provisions that prohibited the CPOA from initiating or supporting a ballot measure for binding interest arbitration.

The CPOA rejected the April 2004 proposals. In September 2004, the County withdrew its request for nonsupport of the binding interest arbitration initiative. The parties finally reached agreement for a three-year contract starting in June 2005.

*Negotiations with the Registered Nurses Professional Association*

In the spring of 2004, the County was also negotiating with the RNPA. The RNPA contract was set to expire in November 2004.

On March 30, 2004, there was a meeting of union and county representatives. The County offered the RNPA a two-year contract extension with a wage increase of 4 percent over two years. There was no mention of the binding interest arbitration initiative.

On April 1, 2004, RNPA representative Knox and county representative Louis Chiaramonte spoke by telephone. Knox expressed her concern that nurses' salaries stay "within the industry standards." She mentioned a recent contract negotiated by Stanford nurses giving them raises totaling 12 percent in the first two years of their three-year contract. Knox suggested a two-year contract extension for the RNPA with raises of 6 percent each year. After the telephone conversation, Chiaramonte "did a quick salary comparison to see what the community had for wage increases."

On April 7, 2004, county representative Chiaramonte presented the RNPA with a written proposal for a two-year contract extension with raises (wage increases and "alignments") totaling 6 percent in the first year and 6 percent in the second year. When presenting the proposal, Chiaramonte characterized it as incomplete, since "a component involving binding interest arbitration [was] to follow." A draft version of that component was reflected in a handwritten document, which Chiaramonte read aloud; it prohibited the RNPA and its leaders from initiating or supporting a ballot measure for binding interest arbitration. As described by Chiaramonte in trial testimony: "That aspect was pretty much a conceptual discussion and at that time I had advised the association I didn't have anything that was finalized, it was still in draft form, and that I'd be giving it back to them at a later date."

On April 8, 2004, the County formally extended the proposal made the day before, including both the same schedule of raises and a separate, typewritten agreement for nonsupport of the binding interest arbitration initiative.

The RNPA rejected the County's April 8 proposal. The parties finally reached agreement on a successor contract approximately a year later, in

April 2005. The successor contract did not include any provision concerning binding interest arbitration.

## PROCEDURAL BACKGROUND

*Pleadings*

In June 2004, plaintiffs filed a verified complaint, which asserted causes of action for (1) unlawful waste of public funds; (2) unlawful restriction of political activities; (3) declaratory relief; and (4) writ relief. The complaint includes allegations concerning the County's bargaining with the DSA, the RNPA, and the CPOA.[2] As relevant to this appeal, the complaint accuses the County of "interfering in the electoral process through the unauthorized expenditure of public funds and public resources to fund a series of wage and compensation and benefit increases for County employees represented by the DSA, the CPOA, [and the] RNPA, . . . as a *quid pro quo* for an agreement not to support the qualification or passage" of the arbitration initiative, Measure C.

In July 2004, the County answered the complaint. It interposed six affirmative defenses, including lack of standing and failure to state a cause of action.

*Pretrial Proceedings*

When plaintiffs filed their complaint in June 2004, they also applied for a preliminary injunction. Opposition and reply papers were submitted. Plaintiffs later sought permission to submit additional evidence based on the October 2004 e-mail by Supervisor Alvarado. Thereafter, on October 26, 2004, the trial court granted plaintiffs' application for a preliminary injunction. The County then petitioned this court for a writ. We stayed the injunction and requested opposition. Plaintiffs opposed the issuance of a writ, and the County replied. Ultimately, we denied the County's writ petition in June 2005.

In December 2005, the County moved for judgment on the pleadings. Plaintiffs opposed the motion, and the court denied it in March 2006.

In June 2006, a complaint in intervention was filed by the Public Employment Relations Board (PERB). PERB and plaintiffs filed cross-motions against each other for judgment on the pleadings. In September

---

[2] The complaint makes no claims concerning the County's bargaining conduct with the GAA, which cosponsored the binding interest arbitration initiative with the RNPA and the CPOA.

2006, the court granted plaintiffs' motion, denied PERB's motion, and dismissed PERB as a party.

In October 2006, the County filed a motion for summary judgment. Plaintiffs opposed the motion, and the court denied it in March 2007. The County then petitioned this court for a writ and for a stay, which we denied in May 2007.

*Trial*

The matter was tried to the court in late May and early June 2007. After pretrial motions and opening arguments, both sides presented testimonial and documentary evidence.

Among plaintiffs' witnesses were union members and officers, including Calabrese and Fitzgerald of the CPOA, Knox of the RNPA, and David Notari and Joseph Charvez of the DSA. Under Evidence Code section 776, plaintiffs called Kristina Cunningham, chief of staff for county Supervisor Blanca Alvarado, as well as county officials Kutras and Leung. The defense witnesses included a union negotiator for the DSA, Ronald Yank, and three county employees who had negotiated with the RNPA and the DSA, Chiaramonte, Kenneth Phillips and Brian McKenna. Defendants also presented two expert witnesses, Arthur Agnos, former state Assembly member and former San Francisco Mayor, and William Gould, Stanford University law professor and former chair of the National Labor Relations Board. The parties' documentary evidence included the County's April 2004 proposals to the CPOA and the RNPA, the April 2004 side letter agreement with the DSA, and the October 2004 e-mail sent by Supervisor Alvarado.

Following the presentation of evidence by both sides, the court requested "closing argument in written form." The parties complied, submitting written arguments in June 2007.

Thereafter, in late June 2007, the court considered plaintiffs' application to reopen the record, in order to submit evidence of their standing as taxpayers. After granting plaintiffs' request, the court stated: "The matter remains submitted. And the Court will continue to work on its decision in this matter."

In July 2007, the court filed its statement of decision, ruling in the County's favor as to all causes of action. As relevant here, the court determined (1) the County did not improperly use public funds for partisan electoral purposes in its bargaining with the unions, and (2) the e-mail sent by Supervisor Alvarado was not an illegal use of public resources for campaign activity.

*Judgment*

Judgment for defendants was entered in September 2007. An amended judgment was entered the following month.

*Appeal*

In November 2007, plaintiffs brought this timely appeal. Plaintiffs seek reversal, based on their contentions that both the County's bargaining activity and Supervisor Alvarado's e-mail constitute illegal expenditures of public funds. The County defends the judgment.

## DISCUSSION

We analyze plaintiffs' appellate contentions in turn, first addressing their claims concerning the contract negotiations and then turning to their arguments about the e-mail. As to each, we first set forth the governing legal principles. Next we summarize the relevant facts, as determined by the trial court. Then we apply the law to the facts.

I. *The County's Bargaining Conduct*

 A. *Legal Principles*

 1. *The* Stanson *Rule*

■ Under the *Stanson* rule, "at least in the absence of clear and explicit legislative authorization, a public agency may not expend public funds to promote a partisan position in an election campaign . . . ." (*Stanson, supra,* 17 Cal.3d at pp. 209–210.) That prohibition does not apply to informational or educational expenditures, however. (*Id.* at p. 221.)

*Stanson* was a taxpayer suit against the Director of the Department of Parks and Recreation, which alleged the department's improper expenditure of more than $5,000 of public funds to promote the passage of a ballot proposition for a recreational bond. (*Stanson, supra,* 17 Cal.3d at p. 209.) The trial court sustained the defendant's demurrer and entered a defense judgment. (*Ibid.*) On appeal, the California Supreme Court reversed. (*Ibid.*)

In its analysis, the *Stanson* court discussed its earlier decision in *Mines v. Del Valle* (1927) 201 Cal. 273 [257 P. 530] (*Mines*). (*Stanson, supra,* 17 Cal.3d at p. 216; *id.* at p. 226 [partially overruling *Mines* on other grounds].) The court also examined case law from other jurisdictions. (*Id.* at pp. 216–217.) After doing so, the court observed that "every court which has addressed the

issue to date has found the use of public funds for partisan campaign purposes improper, either on the ground that such use was not explicitly authorized [citations] or on the broader ground that such expenditures are never appropriate." (*Id.* at p. 217.) The court stated: "Underlying this uniform judicial reluctance to sanction the use of public funds for election campaigns rests an implicit recognition that such expenditures raise potentially serious constitutional questions." (*Ibid.*)

In *Stanson,* the court found it unnecessary to "resolve the serious constitutional question that would be posed by an explicit legislative authorization of the use of public funds for partisan campaigning, because the legislative provisions relied upon by defendant Mott certainly do not authorize such expenditures in the 'clear and unmistakable language' required by *Mines.*" (*Stanson, supra,* 17 Cal.3d at pp. 219–220, quoting *Mines, supra,* 201 Cal. at p. 287.) The court thus concluded "that defendant could not properly authorize the department to spend public funds to campaign for the passage of the bond issue." (*Stanson,* at p. 220.) On the other hand, as "reasonably construed," the pertinent statute provided "the department with authority to spend funds, budgeted for informational purposes, to provide the public with a 'fair presentation' of relevant information relating to a park bond issue on which the agency has labored." (*Id.* at p. 221.) However, because the appeal arose on demurrer, the court had "no occasion to determine whether the department's actual expenditures constituted improper 'campaign' expenditures or authorized 'informational' expenses." (*Id.* at p. 222.)

More than a decade later, the California Supreme Court revisited *Stanson.* (*Keller v. State Bar* (1989) 47 Cal.3d 1152, 1170 [255 Cal.Rptr. 542, 767 P.2d 1020] (*Keller*), revd. on other grounds *sub. nom. Keller v. State Bar of California* (1990) 496 U.S. 1, 17 [110 L.Ed.2d 1, 110 S.Ct. 2228].) In *Keller,* the challenged material was an "educational packet," funded by the State Bar and "sent to local bar associations and other interested groups" prior to the 1982 judicial retention election. (*Keller,* at p. 1171.) The packet included a copy of the State Bar president's inaugural speech, given "about three months before the 1982 election," which "clearly referred to that election." (*Ibid.*) In addition, the packet contained "a sample speech . . . , sample letters to organizations which might provide a speech forum, and a sample press release. It also included fact sheets on crime and conviction rates, judicial selection and retention, and judicial performance and removal criteria. It concluded with quotations concerning judicial independence from Hamilton, Madison, Jefferson, and others." (*Id.* at pp. 1171–1172.) The court described the contents of the packet as "the kind of material which a state election committee distributes to local committees to aid them in the campaign." (*Id.* at p. 1172.) In the court's view, although the packet was "intended to educate the reader because its authors believed an informed campaigner would be a more effective campaigner, its primary purpose . . . was to assist in the

election campaign on behalf of the justices." (*Ibid.*) Citing *Stanson*, the *Keller* court concluded that "the nature and timing of the 1982 publication . . . indicate that it is a form of prohibited election campaigning." (*Keller*, at p. 1172, citation omitted.)

The California Supreme Court again revisited and reaffirmed *Stanson* in its 2009 decision in *Vargas, supra,* 46 Cal.4th 1. At issue in *Vargas* were expenditures by the City of Salinas for communications concerning a local initiative, Measure O, which would have repealed the city's utility tax. (*Vargas, supra,* 46 Cal.4th at p. 7.) Claiming improper use of public funds, the plaintiffs in *Vargas* challenged three particular communications: information posted on the city's Web site, articles in the city's newsletter to residents, and a one-page summary of anticipated service cuts if Measure O passed. (46 Cal.4th at p. 35.) The high court rejected the plaintiffs' challenge, ultimately concluding that "the City engaged in permissible *informational* rather than *campaign* activity . . ." with respect to the Web site postings. (*Id.* at p. 37.) The court reached similar conclusions concerning the newsletter and the one-page summary. (*Id.* at pp. 37–38.)

### a. *Distinguishing informational and campaign activities*

██ As *Stanson, Keller,* and *Vargas* teach, there is a critical distinction between expenditures by a governmental body for informational activities, which generally are permissible, and expenditures for campaign activities, which generally are not. (*Stanson, supra,* 17 Cal.3d at pp. 220–221; *Keller, supra,* 47 Cal.3d at p. 1170; *Vargas, supra,* 46 Cal.4th at p. 35.) As the *Vargas* court explained, "because of potential constitutional questions that may be presented by a public entity's expenditure of public funds in connection with a ballot measure that is to be voted upon in an upcoming election, there is a need to distinguish between (1) 'campaign' materials and activities that presumptively may not be paid for by public funds, and (2) 'informational' material that ordinarily may be financed by public expenditures." (*Vargas,* at p. 7.)

"Frequently, however, the line between unauthorized campaign expenditures and authorized informational activities is not so clear." (*Stanson, supra,* 17 Cal.3d at p. 222.) "In such cases, the determination of the propriety or impropriety of the expenditure depends upon a careful consideration of such factors as the style, tenor and timing of the publication; no hard and fast rule governs every case." (*Ibid.,* fn. omitted; accord, *Vargas, supra,* 46 Cal.4th at p. 7.)

In determining whether partisan campaigning is implicated, another consideration is the audience to which the communication is directed. (*League of*

*Women Voters v. Countywide Crim. Justice Coordination Com.* (1988) 203
Cal.App.3d 529, 550 [250 Cal.Rptr. 161] (*League of Women Voters*); see also,
e.g., *Santa Barbara County Coalition Against Automobile Subsidies v. Santa
Barbara County Assn. of Governments* (2008) 167 Cal.App.4th 1229 [84
Cal.Rptr.3d 714] (*Santa Barbara*); *Yes on Measure A v. City of Lake Forest*
(1997) 60 Cal.App.4th 620, 626 [70 Cal.Rptr.2d 517]; *Miller v. Miller* (1978)
87 Cal.App.3d 762, 768–769, 775 [151 Cal.Rptr. 197].) Where the audience
"is not the electorate per se, . . . there is no attempt to persuade or influence
any vote." (*League of Women Voters*, at p. 550, italics omitted.)

### b. *Neutrality*

As stated in *Stanson*: "A fundamental precept of this nation's demo-
cratic electoral process is that the government may not 'take sides' in election
contests or bestow an unfair advantage on one of several competing factions."
(*Stanson, supra*, 17 Cal.3d at p. 217.)

But as the *Vargas* court explained, that statement "properly must be
understood as singling out a public entity's 'use of the public treasury to
mount an election campaign' [citation] as the potentially constitutionally
suspect conduct, rather than as precluding a public entity from analytically
evaluating a proposed ballot measure and publicly expressing an opinion as
to its merits." (*Vargas, supra*, 46 Cal.4th at p. 36, italics omitted, quoting
*Stanson*, at p. 218.) In other words, "*Stanson* does not preclude a governmen-
tal entity from publicly expressing an opinion with regard to the merits of a
proposed ballot measure, so long as it does not expend public funds to mount
a campaign on the measure." (*Vargas*, at p. 36.)

"Indeed, upon reflection, it is apparent that in many circumstances a
public entity inevitably will 'take sides' on a ballot measure and not be
'neutral' with respect to its adoption." (*Vargas, supra*, 46 Cal.4th at p. 36.) "If
every citizen were to have a right to insist that no one paid by public funds
express a view with which he disagreed, debate over issues of great concern
to the public would be limited to those in the private sector, and the process
of government as we know it radically transformed." (*Keller v. State Bar of
California, supra*, 496 U.S. at pp. 12–13.) "Thus, the mere circumstance that
a public entity may be understood to have an opinion or position regarding
the merits of a ballot measure is not improper." (*Vargas*, at p. 36.)

### c. *Legislative authorization*

In *Stanson*, the court set forth "the general principle that expenditures
by an administrative official are proper only insofar as they are authorized,
explicitly or implicitly, by legislative enactment." (*Stanson, supra*, 17 Cal.3d

at p. 213.) Thus "officials are not free to spend public funds for any 'public purpose' they may choose, but must utilize appropriated funds in accordance with the legislatively designated purpose." (*Ibid.*)

■ Concerning the more specific question of expenditures for partisan campaigning, *Stanson* "reaffirmed the holding in *Mines* that in the absence of clear and unmistakable language specifically authorizing a public entity to expend public funds for campaign activities or materials, the entity lacks authority to make such expenditures." (*Vargas, supra,* 46 Cal.4th at p. 24.)

In this case, the County relies on the MMBA as authorization for its conduct during collective bargaining.

### 2. *The MMBA*

The county and its unions are subject to the MMBA. (*Coachella Valley, supra,* 35 Cal.4th at p. 1077.)

"The MMBA has two stated purposes: (1) to promote full communication between public employers and employees; and (2) to improve personnel management and employer-employee relations within the various public agencies." (*People ex rel. Seal Beach Police Officers Assn. v. City of Seal Beach* (1984) 36 Cal.3d 591, 597 [205 Cal.Rptr. 794, 685 P.2d 1145] (*Seal Beach*).)

■ One key provision of the MMBA is its meet-and-confer requirement. "Section 3505 of the MMBA requires governing bodies of local agencies to 'meet and confer [with employee representatives] in good faith regarding wages, hours, and other terms and conditions of employment' and to 'consider fully' such presentations made by the employee organizations." (*Seal Beach, supra,* 36 Cal.3d at p. 596.)

A related provision broadly describes the scope of representation by employee organizations (unions) to include "all matters relating to employment conditions and employer-employee relations, including, but not limited to, wages, hours, and other terms and conditions of employment," with the exception of matters committed to management prerogative. (§ 3504; see *Seal Beach, supra,* 36 Cal.3d at pp. 601–602; *Claremont Police Officers Assn. v. City of Claremont* (2006) 39 Cal.4th 623, 628 [47 Cal.Rptr.3d 69, 139 P.3d 532] (*Claremont*).)

"Thus, under MMBA the governmental employer has a duty to meet and confer concerning all matters within the scope of representation of its employees by the union." (*Fresno, supra,* 71 Cal.App.4th at p. 92.) There are

mandatory and permissive subjects of bargaining. (*Id.* at p. 93.) "Interest arbitration clauses are a permissive . . . subject of bargaining." (*Id.* at pp. 96–97.)

### B. *Trial Court's Determinations*

In its statement of decision, the trial court explained its rationale for upholding the County's bargaining conduct, saying "the MMBA provided the County with statutory authority to collectively bargain over terms and conditions of employment, which included the issue of binding interest arbitration and a union's waiver of collective activity. Thus, the County was free to expend public funds and resources to support this objective."

The trial court disagreed with plaintiffs' contention that "the County's actions went beyond its legislative authority in the MMBA because it attempted to 'purchase the political silence' of" the DSA, the CPOA, and the RNPA. The court rejected plaintiffs' claim that the County offered a "quid pro quo arrangement" of higher wages for the three unions' "agreement not to support binding interest arbitration." With respect to the DSA, the court said, "as a fundamental matter, since the County was acting within the scope of its collective bargaining authority under the MMBA, the mere suggestion of quid pro quo is nothing more than a recognition that the parties were actively engaged in bargaining. [¶] Moreover, the evidence failed to even demonstrate the existence of a quid pro quo arrangement with regard to the DSA side letter." The court made similar findings concerning the CPOA, stating that cited evidence "belies Plaintiffs' suggestion that the County offered the wage increase specifically to purchase the CPOA's non-support of binding interest arbitration." Likewise, with respect to the RNPA, the court found: "The evidence failed to demonstrate that the increased wages offers were predicated on the binding interest arbitration provision."

### C. *Analysis*

Applying the governing legal precepts to the facts adduced at trial, we find no basis for overturning the challenged determination. As we now explain, (1) the County's conduct was statutorily authorized, (2) there was no quid pro quo arrangement, and (3) the County did not engage in campaign activity.

#### 1. *Under the MMBA, the County was authorized to discuss the arbitration initiative.*

According to plaintiffs: "One of the most important issues on this appeal concerns whether the duty to 'meet and confer' and bargain under the [MMBA] authorized the County to bargain with the unions about their

support for the taxpayer interest arbitration initiative." Plaintiffs frame this question as one of law. In plaintiffs' view, "the County's efforts cannot be categorized as 'mandatory' or 'permissive' bargaining and because the MMBA does not authorize the use of public funds for partisan purposes it cannot authorize the kind of unlawful 'bargaining' the County conducted here."

### a. *Appellate review*

Whether the County's conduct was authorized by the MMBA is a matter of statutory construction. It thus presents a question of law subject to our independent review. (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 83 [45 Cal.Rptr.3d 394, 137 P.3d 218].)

■ When construing a statute, our task is to ascertain the intent of the Legislature, thereby giving effect to the law's purpose. (*Coachella Valley, supra*, 35 Cal.4th at p. 1083; *San Leandro Teachers Assn. v. Governing Bd. of San Leandro Unified School Dist.* (2009) 46 Cal.4th 822, 831 [95 Cal.Rptr.3d 164, 209 P.3d 73] (*San Leandro*).)

### b. *Binding interest arbitration as a proper subject of collective bargaining*

■ Among its purposes, the MMBA aims to "to promote full communication" and "to improve . . . relations" between public employers and employees. (*Seal Beach, supra*, 36 Cal.3d at p. 597.) Consistent with those purposes, the MMBA "provides for negotiation ('meet and confer')" as a means of resolving public labor disputes. (*Fire Fighters Union v. City of Vallejo* (1974) 12 Cal.3d 608, 614, fn. 4 [116 Cal.Rptr. 507, 526 P.2d 971].) "The meet-and-confer requirement is an essential component of the state's legislative scheme for regulating . . . employment practices." (*Seal Beach*, at p. 599.) "The duty to meet and confer in good faith is limited to matters within the 'scope of representation' . . ." however. (*Claremont, supra*, 39 Cal.4th at p. 630.)

The broad statutory definition of "scope of representation" includes matters concerning "wages, hours, and other terms and conditions of employment," while excepting certain management matters. (§ 3504.) "The definition of 'scope of representation' and its exception are 'arguably vague' and 'overlapping.' " (*Claremont, supra*, 39 Cal.4th at p. 631.) But there is a significant body of federal law "interpreting the meaning of the federal act's 'wages, hours and other terms and conditions of employment.' " (*Fire Fighters Union v. City of Vallejo, supra*, 12 Cal.3d at p. 616.) And California courts "have frequently referred to such federal precedent in interpreting parallel language in state labor legislation." (*Ibid.*)

██ Under state law, although interest arbitration is not a mandatory subject of contract negotiations, it is a permissive subject about which the parties properly may meet and confer. (*Fresno, supra,* 71 Cal.App.4th at pp. 96–97.) Likewise, under federal law, binding interest arbitration "is not a mandatory subject of bargaining, since its effect on terms and conditions of employment during the contract period is at best remote." (*N.L.R.B. v. Columbus Printing Pressmen and Assistants' Union No. 252* (5th Cir. 1976) 543 F.2d 1161, 1166.) "It is well settled in the federal courts that interest arbitration is a permissive bargaining subject . . ." however. (*International Ass'n of Firefighters, Local 1264 v. Municipality of Anchorage* (Alaska 1999) 971 P.2d 156, 157.)

c. *Propriety of the discussions here*

While acknowledging the general principle that binding interest arbitration is a permissive subject of bargaining, plaintiffs nevertheless argue that it was improper for the County to negotiate over it here. According to plaintiffs, "an interest arbitration clause in a contract itself might have constituted a permissive topic of collective bargaining. But in this case the interest arbitration measure . . . was a constitutionally protective initiative measure presented to the voters by taxpayers. This placed it outside the confines of union-management collective bargaining and within the broader arena of the electoral process."

We find that argument unpersuasive.

For one thing, as California Supreme Court precedent recognizes, the electoral process and the MMBA can coexist. In *Seal Beach,* the court held that "the city council was required to meet and confer with the [unions] before it proposed charter amendments which affect matters within their scope of representation. The MMBA requires such action and the city council cannot avoid the requirement by use of its right to propose charter amendments." (*Seal Beach, supra,* 36 Cal.3d at p. 602.) As plaintiffs point out, *Seal Beach* concerned a mandatory subject of bargaining. (*Id.* at p. 595, fn. 2.) Moreover, it did "not involve the question whether the meet-and-confer requirement was intended to apply to charter amendments proposed by initiative." (*Id.* at p. 599, fn. 8.) Even so, the reasoning of *Seal Beach* undercuts plaintiffs' assertion that collective bargaining and the initiative process are mutually exclusive.

██ In any event, plaintiffs' appellate contention is contrary to the position that they consistently urged below. "It is a firmly entrenched principle of appellate practice that litigants must adhere to the theory on which a case was tried." (*Brown v. Boren* (1999) 74 Cal.App.4th 1303, 1316

[88 Cal.Rptr.2d 758].) In the trial court, plaintiffs recognized the propriety of bargaining over union involvement with the binding interest arbitration initiative. Plaintiffs expressed that position most succinctly in their closing arguments, in which they acknowledged that "the County could legitimately negotiate with a union to withdraw from an initiative," but nevertheless argued that the County exceeded those bounds in an attempt to "stifle partisan political participation by the unions" and their members. Plaintiffs' closing argument echoed the view expressed in their opening statement at trial.[3] It was reinforced by the trial testimony of plaintiff Knox.[4] And it was consistent with pretrial arguments made by plaintiffs in opposition to the County's summary judgment motion.[5]

The position espoused by plaintiffs at trial comports with our construction of the MMBA, which recognizes interest arbitration as a permissible subject of collective bargaining. (§§ 3504, 3505; *Fresno, supra,* 71 Cal.App.4th at pp. 96–97.) We therefore affirm the trial court's conclusion that the MMBA authorized the County's discussion of binding interest arbitration at the bargaining table, even though the subject was presented as a proposed voter initiative, not as a contract clause.

---

[3] Plaintiffs stated: "We do not argue that the County couldn't have gone to DSA and [said] you may be interested in being named as one of the beneficiaries of this proposed ballot initiative. We prefer that you don't do it. And I'll tell you what, we'll give you wages and you withdraw. No problem with that. [¶] Where they crossed the line was they said to the sheriffs as part of the deal for our giving you the increased wages we also want you committed not to support that measure. . . . That's where they crossed the line with the DSA. [¶] There is no question that they could have gone to either CPOA or RNPA and said to them at any time, we would prefer that you not be part of this. . . . [The County] can always negotiate those things with the unions, but they didn't do that. They went far beyond that. They said not only do we want you not to participate, we want you to agree not to support this or any other initiative measure for binding interest arbitration that may come down the line for the . . . life of this new contract. [¶] . . . [¶] In short, they crossed the line."

[4] Knox agreed that the County was "free" to discuss binding interest arbitration with the RNPA and other unions. Knox further testified that she "would expect the County to use County time, resources, and personnel" in carrying out its "obligation to engage in collective bargaining with its unions over issues of wages, hours and working conditions"—which included, in her view, binding interest arbitration.

[5] In their memorandum of points and authorities, plaintiffs argued: "County officials are more than entitled to hold the view that the binding interest arbitration ballot initiative was not good public policy. They are more than entitled to express that view at a collective bargaining table. What they are not permitted to do, and which they did in fact do, is spend taxpayer dollars for the purpose of defeating a ballot initiative, nor could the County restrict or attempt to restrict political activity of its employees."

Plaintiffs also argued: "It is true that other labor groups could have agreed to refuse to support Measure C as the DSA did. It is also true that they *could* have reached such an agreement as part of a collectively bargained deal. However, when the facts demonstrate that the County's offer of such a deal is made in exchange for the payment of money, then the County has crossed over the line, and no collective bargaining principle or law makes permissible the expenditures for partisan purposes."

That said, however, we find nothing in the MMBA that explicitly authorizes public expenditures for *partisan campaigning* in the requisite "clear and unmistakable language" that binding California Supreme Court precedent demands. (*Mines, supra*, 201 Cal. at p. 287; see *Stanson, supra*, 17 Cal.3d at pp. 219–220; *Vargas, supra*, 46 Cal.4th at p. 24.) Therefore, we must consider whether the County's conduct during collective bargaining constitutes impermissible partisan campaign activity. As we now explain, it does not.

> 2. *The County did not offer higher compensation as a quid pro quo for the unions' political silence.*

Plaintiffs contend that the County "coupled the offer of substantial pay raises in exchange for, and as part of, an indivisible 'package' that included a prohibition against joining *or supporting* the taxpayer initiative." While disclaiming the need "to establish a quid pro quo . . . in order to show a *Stanson* violation" in this case, plaintiffs nevertheless contend that "contrary to the trial court's ill founded conclusions there was substantial evidence in the record" to support their quid quo pro claim.

> a. *Standard and scope of appellate review*

As both parties acknowledge, we review the trial court's determinations on this point for substantial evidence. Those determinations are essentially factual. (Cf. *Miller v. Miller, supra*, 87 Cal.App.3d at p. 772 ["question of whether a given public communication is 'informational' or 'promotional' is . . . a factual issue"].) The substantial evidence rule governs factual determinations. (*Nordquist v. McGraw-Hill Broadcasting Co.* (1995) 32 Cal.App.4th 555, 561 [38 Cal.Rptr.2d 221].) Under that deferential standard, when "the evidence is in conflict, the appellate court will not disturb the findings of the trial court. The court must consider the evidence in the light most favorable to the prevailing party, giving that party the benefit of every reasonable inference and resolving conflicts in support of the judgment." (*Ibid.*) In other words, "findings must be sustained if they are supported by substantial evidence, even though the evidence could also have justified contrary findings." (*Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 557 [66 Cal.Rptr.3d 1].)

As the County points out, "an appellant who challenges a factual determination in the trial court . . . must marshal all of the record evidence relevant to the point in question and affirmatively demonstrate its insufficiency to sustain the challenged finding." (*Yield Dynamics, Inc. v. TEA Systems Corp., supra*, 154 Cal.App.4th at p. 557, italics omitted.) "If one is going to make a 'the-facts-compel-that-I-win-as-a-matter-of-law' argument, one's brief must fairly state all the evidence." (*McCauley v. Howard Jarvis Taxpayers*

*Assn.* (1998) 68 Cal.App.4th 1255, 1266 [80 Cal.Rptr.2d 900].) Failure to comply with that requirement risks forfeiture of the claim. (*Ibid.*) The County asks us to find forfeiture here. In reply, plaintiffs assert that they "have more than forthrightly summarized and properly cited the evidence on this appeal." We cannot agree. As a review of plaintiffs' appellate briefs demonstrates, "the facts stated and the inferences drawn . . . are those most favorable to [them] rather than to [defendants]." (*Oliver v. Board of Trustees* (1986) 181 Cal.App.3d 824, 832 [227 Cal.Rptr. 1].) Nevertheless, the County's brief cites "considerable evidence supporting the order"—a circumstance that eases our task on appeal. (*Ibid.*; cf. *Goehring v. Chapman University* (2004) 121 Cal.App.4th 353, 363, fn. 7 [17 Cal.Rptr.3d 39] [reaching the merits despite appellant's failure to provide a record, where respondent "submitted an adequate record"].) For that reason, and without excusing the defects in plaintiffs' briefs, we shall address their evidentiary challenges on the merits. (*Wershba v. Apple Computer, Inc.* (2001) 91 Cal.App.4th 224, 237 [110 Cal.Rptr.2d 145].)

Plaintiffs' quid pro quo claims in this court are directed to the County's bargaining efforts with the CPOA and the RNPA. Although plaintiffs argued below that the County's side letter agreement with DSA was an improper quid pro quo arrangement, they do not renew that argument here. We therefore limit our discussion to plaintiffs' challenges concerning the CPOA and the RNPA negotiations. (*Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4 [188 Cal.Rptr. 115, 655 P.2d 317]; *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6 [76 Cal.Rptr.2d 457].)

### b. *Negotiations with the CPOA*

As the trial court noted in its statement of decision: "Plaintiffs infer a quid pro quo arrangement because the April 7 and 12, 2004 package proposals were the County's first offers to increase wages in over a year of collective bargaining, and these proposals demanded that the CPOA agree not to support binding interest arbitration." The court rejected that proffered inference. In the court's view, "the evidence demonstrated that the County did offer the CPOA a wage increase of 18% over five and half years on or about March 29, 2004, a week before the April 7, 2004 package proposal." Citing the testimony of Kutras, the court said: "This evidence belies Plaintiffs' suggestion that the County offered the wage increase specifically to purchase the CPOA's non-support of binding interest arbitration."

Plaintiffs attack this finding, saying: "The sole evidence that the trial court offers for this version of events is the plainly incompetent testimony of County Executive Peter Kutras." In challenging Kutras's testimony that the first wage increase offer predated the provision concerning the binding

interest arbitration initiative, plaintiffs assert that it was undermined by his later testimony and that it was "contradicted by the County's written proposals" to the CPOA.

We find no merit in plaintiffs' argument. Taken as a whole, the evidence does not compel us to reject Kutras's testimony. Nor does the law support plaintiffs' request that we do so. "Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category." (*People v. Huston* (1943) 21 Cal.2d 690, 693 [134 P.2d 758], overruled on another ground in *People v. Burton* (1961) 55 Cal.2d 328, 352 [11 Cal.Rptr. 65, 359 P.2d 433].) "To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions." (*Huston*, at p. 693.) Such cases are rare indeed. (*Evje v. City Title Ins. Co.* (1953) 120 Cal.App.2d 488, 492 [261 P.2d 279].)

This case does not warrant the conclusion that Kutras's testimony was inherently improbable. The claimed falsity is not "apparent without resorting to inferences or deductions." (*People v. Huston, supra*, 21 Cal.2d at p. 693.) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*Ibid.*) In short, plaintiffs' claim that Kutras's testimony is inherently unbelievable cannot be sustained. It thus provides no basis for reversal.

Moreover, Kutras's testimony is not the only evidence supporting the trial court's determination that the County made no quid pro quo offer to the CPOA. The court drew inferences in support of that determination from several facts. One was that the County's April 2004 wage offers were far below the union's demands, "hardly the incentive necessary for the CPOA to accept both the wage offer itself along with the binding interest arbitration provision." Another was that the April 12 proposal offered no increase in wages over the April 7 proposal, when the binding interest arbitration proposal was first introduced, which "suggests that the wage increase was independent of the terms of the binding interest arbitration provision." The court also noted that the parties' 2005 "successor MOU . . . did not include a binding interest arbitration provision, but there was no evidence that the wage increase in the successor MOU was lowered due to removal of the binding interest arbitration provision." Furthermore, though the trial court did not expressly rely on it, there was evidence that it was the CPOA that initiated discussions about the binding interest arbitration measure, not the County.

For all these reasons, we reject plaintiffs' evidentiary challenges to the trial court's determination concerning the CPOA negotiations.

### c. Negotiations with the RNPA

With respect to the County's negotiations with the RNPA, the trial court made these findings: "The evidence failed to demonstrate that the increased wages offers were predicated on the binding interest arbitration provision. The binding interest arbitration provision was not even a part of the actual April 7, 2004 package proposal, but rather, read from a draft County document. While the April 8, 2004 proposal contained a binding interest arbitration provision, the wage offer remained the same as in the April 7 proposal, and there was no evidence that the wage offer was necessarily conditioned on this provision. The fact that the provision was an 'all or nothing' offer was consistent with the nature of packaged proposals and does not suggest that the wage increase was conditioned on any one provision such as the binding interest arbitration provision. Instead, there was evidence that the increased wage offer was based on discussions with Knox regarding competitive salary rates of nurses in other local area hospitals, as well as salary comparison investigations conducted by the County between March 30, 2004 and April 7, 2004."

Plaintiffs challenge those determinations, arguing that the trial court erred in not connecting the April 2004 offers of a pay increase and the introduction of the binding interest arbitration provision. In their opening brief on appeal, plaintiffs argue that "substantial evidence clearly refutes the trial court's insupportable claim that the sharply increased wage offer to the RNPA was not tied to the new but absolute condition that the nurses' association neither join nor support the initiative." In their reply brief, plaintiffs rely on the "incontestable" fact that the County's increased wage offer was "accompanied by the County's non-negotiable condition that the union withdraw its support for the taxpayer ballot measure."

Under the substantial evidence review standard that governs this challenge, plaintiffs' arguments are unavailing. Here, as in many cases, the "trial court's decision is predominantly based upon questions of credibility, weighing conflicting evidence and drawing reasonable inferences from the voluminous evidence presented." (*Jordan v. City of Santa Barbara* (1996) 46 Cal.App.4th 1245, 1254 [54 Cal.Rptr.2d 340].) "When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478–479 [243 Cal.Rptr. 902, 749 P.2d 339]; accord, *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 328 [17 Cal.Rptr.3d 906, 96 P.3d 194].) In this case, the trial court's decision was

based on evidence that the County's increased wage offer followed its receipt of information about the Stanford nurses' recent wage increases and its investigation of comparable industry salaries. This evidence provides a proper basis for the court's inference that the County's offer of increased wages was not "predicated on the binding interest arbitration provision." Contrary to plaintiffs' contention, the fact that the proposed increase "accompanied" the proposed provision does not compel the contrary inference that the proposal was an attempted quid pro quo arrangement.

We therefore reject plaintiffs' arguments concerning the RNPA negotiations.

3. *The County did not engage in campaign activity by addressing the proposed initiative during collective bargaining.*

Having confirmed that there was no quid quo pro arrangement, we now consider whether it was a misuse of public resources to discuss the initiative measure as part of the process of bargaining with the unions. That question "turns upon whether the activities fall within the category of informational activities that may be funded through . . . general appropriations or, instead, constitute campaign activities that may not be paid for by public funds in the absence of . . . explicit authorization." (*Vargas, supra*, 46 Cal.4th at p. 35.)

a. *Appellate review*

The substantial evidence rule governs this issue. (See *Stanson, supra*, 17 Cal.3d at pp. 222–223 [determining whether defendant engaged in campaign activity would depend on proof of plaintiff's allegations]; *Miller v. Miller, supra*, 87 Cal.App.3d at p. 772 [determining whether communication constituted campaign activity was "a factual issue"]; cf. *McCauley v. Howard Jarvis Taxpayers Assn., supra*, 68 Cal.App.4th at pp. 1264–1265 [concluding that substantial evidence supported the determination that a challenged communication was not express advocacy].)

In analyzing this question, we consider the factors enunciated in decisional law, starting with the type of activity or communication. (*Stanson, supra*, 17 Cal.3d at p. 221; *Vargas, supra*, 46 Cal.4th at pp. 24, 35.) Other factors include "the style, tenor and timing" of the communication. (*Stanson*, at p. 222; see *Keller, supra*, 47 Cal.3d at p. 1171; *Vargas*, at p. 7.) Another relevant consideration is the audience to which the communication is directed. (*League of Women Voters, supra*, 203 Cal.App.3d at p. 550.) We examine each of those factors in turn.

b. *Type of activity*

As explained in *Vargas*, "the *Stanson* decision explicitly identified a number of materials and activities that unquestionably constitute campaign activities (without any need to consider their 'style, tenor and timing')—for example, the use of public funds to purchase bumper stickers, posters, advertising 'floats,' or television and radio 'spots'—and also identified a number of activities that are clearly informational—for example, providing a fair presentation of facts in response to a citizen's request for information." (*Vargas, supra,* 46 Cal.4th at p. 33, citing *Stanson, supra,* 17 Cal.3d at p. 221.)

Here, the challenged activity is the County's conduct in discussing the unions' nonsupport of the proposed ballot initiative as part of the collective bargaining process. Plainly, that conduct does not "constitute the kind of typical campaign materials or activities" identified in *Stanson.* (*Vargas, supra,* 46 Cal.4th at p. 35, discussing *Stanson, supra,* 17 Cal.3d at p. 221.) To the contrary, it more closely resembles pursuit of "a proper 'informational' role" by presenting the agency's "view of a ballot proposal at a meeting of [an] organization" that has expressed interest in the topic. (*Stanson,* at p. 221.)

The fact that the County's conduct is not typical campaigning activity is not dispositive, however, because "the items listed in *Stanson* do not exhaust the category of potential campaign materials or activities." (*Vargas, supra,* 46 Cal.4th at p. 35.) We therefore examine other pertinent factors.

c. *Style and tenor*

An examination of the style and tenor of a challenged communication necessarily begins with its language. Here, under the nearly identical proposals made by the County to the CPOA and to the RNPA, each union—for itself and for "its officials"—would have agreed not to "directly or indirectly initiate or support any effort to place binding interest arbitration on the ballot. As to efforts already initiated to place binding interest arbitration on the ballot," each union would be obliged to "take immediate action to disassociate itself from such action." Furthermore, the unions would agree not to initiate or support "efforts to place binding interest arbitration on the ballot" in the future.[6]

---

[6] The full text of the County's proposal regarding the binding interest arbitration initiative, as presented to the RNPA on April 8, 2004, reads as follows: "The Registered Nurses Professional Association (RNPA) agrees that effective immediately and for the term of the Memorandum of Understanding that expires November 5, 2006, the RNPA and its officials will not directly or indirectly initiate or support any effort to place binding interest arbitration on the ballot. As to efforts already initiated to place binding interest arbitration on the ballot,

Here, as in *Keller*, the "style and tenor" of the challenged material "is basically informative and factual, but without claim of impartiality . . . ." (*Keller, supra*, 47 Cal.3d at p. 1172.) But the cases' similarity ends there. *Keller* involved an educational packet related to an upcoming judicial retention election, which contained "the kind of material which a state election committee distributes to local committees to aid them in the campaign." (*Ibid.*) Here, by contrast, the communications were not intended for further distribution or for direct use in the November election. *Keller* thus does not support characterizing the bargaining proposals as campaign materials.

Nor does *Vargas* compel a finding that the proposals' style and tenor renders them campaign activity. In *Vargas*, the plaintiffs contended "that when the 'style, tenor and timing' of the challenged communications are taken into account, the communications should be viewed as improper campaign materials rather than as permissible informational materials." (*Vargas, supra*, 46 Cal.4th at p. 35.) That contention hinged on the claim that the challenged communications failed to set forth the "competing views" held by the plaintiffs and other taxpayers, with the result that the materials "improperly 'took sides' on the ballot measure and should be viewed as improper campaign activity." (*Ibid.*) The court rejected that argument, concluding instead that all of the challenged communications "constitute permissible informational activities—and not inappropriate campaign activities." (*Id.* at p. 40.)

Here, as in *Vargas*, the fact that the County expressed "an opinion or position regarding the merits of a ballot measure is not improper." (*Vargas, supra*, 46 Cal.4th at p. 36.) Furthermore, the County's proposals were framed in the dispassionate language of contract, not in the exhortatory tone of

---

RNPA will take immediate action to disassociate itself from such action and petition drive and take action to have references to 'public health employees' and 'any person employed by the County of Santa Clara as a classified or unclassified registered nurse in the Registered Nurses bargaining unit' removed entirely from the ballot language in the proposed binding interest arbitration ballot measure. In addition, if any future efforts to place binding interest arbitration on the ballot are initiated, RNPA will not directly or indirectly initiate or support any effort."

The operative language in the CPOA proposal is virtually identical. As presented to the CPOA on April 12, 2004, it provides: "The Correctional Peace Officers' Association (CPOA) agrees that effective immediately and for the term of the Memorandum of Understanding that expires August 15, 2007, the CPOA and its officials will not directly or indirectly initiate or support any effort to place binding interest arbitration on the ballot. As to efforts already initiated to place binding interest arbitration on the ballot, CPOA will take immediate action to disassociate itself from such action and petition drive and take action to have references to 'public safety employees' and 'County of Santa Clara correctional sergeants, correctional lieutenants, sheriff's correctional lieutenants' removed entirely from the ballot language in the proposed binding interest arbitration ballot measure. In addition, if any future efforts to place binding interest arbitration on the ballot are initiated, CPOA will not directly or indirectly initiate or support any effort."

persuasion. Thus, their "style and tenor is not at all comparable to traditional campaign material." (*Id.* at p. 38.)

### d. *Timing*

In this case, the challenged collective bargaining activity took place in April 2004, between the 7th and the 12th. That was after Knox filed the notice of intent to circulate a petition to qualify the measure for the ballot (Apr. 2), but before proponents began gathering signatures (Apr. 23), before the initiative qualified for the ballot (June 23), and before the county adopted a resolution placing the initiative before the voters (Aug. 3).

In terms of timing, this case is similar to *Santa Barbara, supra*, 167 Cal.App.4th 1229. There, the defendant agency "formulated a plan outlining the county's transportation needs, and proposed a ballot measure that would impose a one-half percent sales tax to pay for the projects set forth in its plan." (*Id.* at p. 1233.) The plaintiff sued, asserting that the defendant "unlawfully advocated and spent public funds for passage of the ballot measure." (*Ibid.*) The trial court dismissed the suit, and the appellate court affirmed. (*Id.* at p. 1234.) In affirming, the court relied on two grounds: the existence of express statutory authorization for the expenditures and the fact that the challenged activity predated any campaign. (*Id.* at pp. 1239–1240.)

As relevant here, the *Santa Barbara* court concluded that the "activity challenged by appellant did not occur in an election contest or campaign." (*Santa Barbara, supra*, 167 Cal.App.4th at p. 1240.) Rather, the court observed, the activity "occurred before . . . finalization of the ordinance placing [the measure] on the ballot, and before the county board of supervisors had adopted the ordinance and certified [the measure] for the 2008 ballot." (*Ibid.*) For that reason, the court explained, *Stanson* and other decisions were distinguishable. "*Stanson* involved the expenditure of funds for partisan campaign materials and for speaking engagements to promote passage of a bond measure that had already been placed on the ballot and was the subject of a current election campaign." (*Ibid.*) "The cases cited in *Stanson* and more recent cases also concern bond or other ballot measures that had already been qualified for placement on the ballot." (*Ibid.*; see also, e.g., *League of Women Voters, supra*, 203 Cal.App.3d at pp. 548–549.) As the *Santa Barbara* court acknowledged, "the drafting and sponsorship of a ballot measure is a necessary prerequisite to the election campaign that follows its placement on the ballot." (*Santa Barbara*, at p. 1241.) But " 'prior to and through the drafting stage of a proposed initiative, the action is not taken to attempt to influence voters either to qualify or to pass an initiative measure; there is as yet nothing to proceed to either of those stages.' " (*Ibid.*, quoting *League of Women Voters*, at p. 550.)

The *Santa Barbara* court thus concluded: "Nothing in *Stanson* suggests that the formulation and drafting of a proposed ballot measure before its qualification for the ballot constitutes partisan campaigning for the ballot measure." (*Santa Barbara, supra,* 167 Cal.App.4th at p. 1241; see also *League of Women Voters, supra,* 203 Cal.App.3d at p. 548 ["the formulation and drafting of a proposed initiative does not fall within the purview of . . . partisan campaigning . . ."].)

For their part, plaintiffs rely on *California Common Cause v. Duffy* (1987) 200 Cal.App.3d 730 [246 Cal.Rptr. 285]. That appeal over attorney fees arose from a taxpayer suit against the Sheriff of San Diego County, John Duffy. (*Id.* at p. 738.) Duffy had appeared at press conferences "sponsored by Crime Victims for Court Reform, a private political committee organized to encourage Chief Justice Rose Bird to resign and failing that, to encourage the public to vote against her retention." (*Ibid.*) "Duffy announced his support for the political committee and stated he would help distribute postcards containing a strongly-worded anti-Bird message." (*Ibid.*) As taxpayers, the plaintiffs "sought to establish the illegality of the distribution of anti-Bird postcards by on-duty uniformed deputies and using departmental supplies." (*Id.* at p. 742.) The court found that "the postcard distribution scheme was clearly partisan political activity, not informational activity." (*Id.* at p. 747.)

Concerning timing, the court said this: "The fact the retention election was more than two years away did not make the postcards any less political. The campaign involving the retention of Chief Justice Bird was already underway as evidenced by the organization of campaign committees . . ." identified in a memorandum by the defendant. (*California Common Cause v. Duffy, supra,* 200 Cal.App.3d at p. 748.)

In this case, the undisputed evidence supports a determination that the election campaign was not yet underway. Although the notice of intent had been filed, it would be months before the initiative qualified for the ballot. Under these circumstances, we conclude, the challenged collective bargaining activity "did not occur in an election contest or campaign." (*Santa Barbara, supra,* 167 Cal.App.4th at p. 1240.)

 e. *Audience*

Concerning both the CPOA and the RNPA, the trial court found that "the proposals were made during collective bargaining with [each union] and therefore were intended to influence the actions of [each union] in its stance on binding interest arbitration, not the actions of voters."

██ That determination finds support in case authority, which holds: "The audience at which these activities are directed is not the electorate per

se, but only potentially interested private citizens; there is no attempt to persuade or influence *any* vote. [Citation.] It follows those activities cannot reasonably be construed as partisan campaigning." (*League of Women Voters, supra,* 203 Cal.App.3d at p. 550; accord, *Yes on Measure A v. City of Lake Forest, supra,* 60 Cal.App.4th at p. 626; *Santa Barbara, supra,* 167 Cal.App.4th at p. 1241.) By contrast, activities in connection with a ballot measure "directed at swaying voters' opinions are improper, even pre-filing." (88 Ops.Cal.Atty.Gen. 46, 50 (2005).) Here, however, as the trial court found, the activity in question was intended to sway the unions, not the voters.

### f. *Conclusion*

Having examined each of the pertinent factors in light of the record, we conclude that the County did "not expend public funds to promote a partisan position in an election campaign." (*Stanson, supra,* 17 Cal.3d at pp. 209–210.) First, the collective bargaining conduct is not typical campaign activity under *Stanson.* (*Stanson, supra,* 17 Cal.3d at p. 221; *Vargas, supra,* 46 Cal.4th at p. 35.) Second, the "style and tenor" of the bargaining proposals "is not at all comparable to traditional campaign material." (*Vargas,* at p. 38.) Third, in terms of timing, the activity preceded the measure's qualification for the ballot and thus "did not occur in an election contest or campaign." (*Santa Barbara, supra,* 167 Cal.App.4th at p. 1240.) Fourth, the collective bargaining activity was directed at the unions, not at the electorate. (*Id.* at p. 1241.)

In sum, in light of the above analysis, we reject plaintiffs' arguments that the County violated *Stanson* in bargaining with the unions about support for the binding interest arbitration initiative.

We next address plaintiffs' claims about the e-mail sent by Supervisor Alvarado, framed by plaintiffs as both statutory breaches and *Stanson* violations.

## II. *Supervisor Alvarado's E-mail*

### A. *Legal Principles*

#### 1. *Statutory Provisions*

##### a. *Section 8314*

Section 8314 makes it "unlawful for any elected state or local officer . . . to use or permit others to use public resources for a campaign activity, or personal or other purposes which are not authorized by law." (§ 8314, subd. (a).) Under its statutory definitions, section 8314 prohibits any

"use of public resources which is substantial enough to result in a gain or advantage to the user or a loss to the state or any local agency for which a monetary value may be estimated." (*Id.*, subd. (b)(4).) But that section does not "prohibit the use of public resources for providing information to the public about the possible effects of any bond issue or other ballot measure on state activities, operations, or policies, provided that (1) the informational activities are otherwise authorized by the constitution or laws of this state, and (2) the information provided constitutes a fair and impartial presentation of relevant facts to aid the electorate in reaching an informed judgment regarding the bond issue or ballot measure." (*Id.*, subd. (d).)

 "Campaign activity" includes "an expenditure as defined in Section 82025." (§ 8314, subd. (b)(2).) That excludes any expenditure where "it is clear from the surrounding circumstances that it is not made for political purposes." (§ 82025.) As defined in accompanying regulations, the term "political purposes" includes "influencing or attempting to influence the action of the voters for or against . . . the qualification or passage of any measure." (Cal. Code Regs., tit. 2, § 18225, subd. (a)(1).) That occurs through use of "express words of advocacy . . . so that the communication, taken as a whole, unambiguously urges a particular result in an election." (*Id.*, subd. (b)(2).)

" 'Campaign activity' does not include the incidental and minimal use of public resources, such as equipment or office space, for campaign purposes, including the referral of unsolicited political mail, telephone calls, and visitors to private political entities." (§ 8314, subd. (b)(2).) " 'Public resources' means any property or asset owned by the state or any local agency, including, but not limited to, land, buildings, facilities, funds, equipment, supplies, telephones, computers, vehicles, travel, and state-compensated time." (*Id.*, subd. (b)(3); see *San Leandro, supra*, 46 Cal.4th at p. 835 [for purposes of Ed. Code, § 7054, "the broad term 'equipment' " encompasses internal school mailboxes].)

### b. *Section 54964*

 Under section 54964, "An officer, employee, or consultant of a local agency may not expend or authorize the expenditure of any of the funds of the local agency to support or oppose the approval or rejection of a ballot measure, or the election or defeat of a candidate, by the voters." (§ 54964, subd. (a).) "Expenditure" is defined for purposes of this section as "a payment of local agency funds that is used for communications that expressly advocate the approval or rejection of a clearly identified ballot measure, or the election or defeat of a clearly identified candidate, by the voters." (*Id.*, subd. (b)(3).) "This section does not prohibit the expenditure of local agency

funds to provide information to the public about the possible effects of a ballot measure on the activities, operations, or policies of the local agency, if both of the following conditions are met: [¶] (1) The informational activities are not otherwise prohibited by the Constitution or laws of this state. [¶] (2) The information provided constitutes an accurate, fair, and impartial presentation of relevant facts to aid the voters in reaching an informed judgment regarding the ballot measure." (*Id.*, subd. (c).)

### 2. *Application to* Stanson *Claims*

■ Courts must exercise caution in applying these statutory and regulatory provisions to claims of *Stanson* violations. As *Vargas* teaches, they were "not intended, and should not be interpreted, to displace the analysis and standard set forth" in *Stanson*. (*Vargas, supra,* 46 Cal.4th at p. 8 [rejecting use of the express advocacy standard in § 54964, subd. (b)(3)]; see *id.* at pp. 31–32 [rejecting use of the express advocacy standard in Cal. Code Regs., tit. 2, § 18225, subd. (b)(2)].)

As exhaustively discussed above, *Stanson* generally prohibits the expenditure of "public funds to promote a partisan position in an election campaign." (*Stanson, supra,* 17 Cal.3d at pp. 209–210.) In deciding whether partisan campaigning is implicated, the court considers various factors, including "the style, tenor and timing" of the communication. (*Id.* at p. 222; see *Vargas, supra,* 46 Cal.4th at p. 7.)

### B. *Trial Court's Determination*

In its statement of decision, the court implicitly found that the e-mail did not constitute campaign activity. In the court's words, "while the attached editorial piece advocated opposition to Measure C, the text of the Alvarado e-mail itself simply instructed recipients to 'educate yourself and your neighbors on these complex issues.' " "More importantly," the court found, the e-mail fell within the statutory "exemption for 'the incidental and minimal use of public resources, such as equipment or office space, for campaign purposes,' " which includes referrals following unsolicited contact.

### C. *Analysis*

We review the trial court's factual determinations concerning the e-mail for substantial evidence. (*Miller v. Miller, supra,* 87 Cal.App.3d at p. 772; *McCauley v. Howard Jarvis Taxpayers Assn., supra,* 68 Cal.App.4th at pp. 1264–1265.) Plaintiffs urge de novo review, asserting: "The facts here are entirely undisputed." But de novo review is not appropriate when the facts—even if uncontroverted—give rise to conflicting inferences. (*Mary M. v.*

*City of Los Angeles* (1991) 54 Cal.3d 202, 213–214 [285 Cal.Rptr. 99, 814 P.2d 1341]; *Sav-On Drug Stores, Inc. v. Superior Court, supra,* 34 Cal.4th at p. 328.) In this case, several factual issues are open to conflicting interpretation, including Alvarado's reasons for sending the e-mail. The substantial evidence rule thus applies. Applying that rule, we review the court's findings concerning the challenged communication, which must be examined in its entirety.

1. *Both the text of the e-mail and the attached editorial must be considered.*

The entire e-mail was admitted into evidence at trial, both text and attachment. The trial court found that the text of the e-mail was "neutral" while the attached editorial "advocated" defeat of Measure C.[7]

Focusing on the attached editorial alone, plaintiffs assert that it constitutes express advocacy in violation of section 8314. (§ 8314, subd. (a); Cal. Code Regs., tit. 2, § 18225, subd. (b)(2); see also § 54964, subd. (b)(3).) While plaintiffs quote extensively from the editorial, they do not discuss or even mention the text of the challenged e-mail.

Plaintiffs' focus is misplaced. Both components of the e-mail must be considered. We examine each in turn.

---

[7] The body of the e-mail reads in pertinent part as follows: "We know that the upcoming election on November 2 is vital. Our ballot contains several choices that will determine the direction at the local, state, and national levels for years to come. With so many choices to make, I want you to be aware of three County-related measures—Measures A, B, and C. [¶] The Board of Supervisors unanimously supports Measures A and B, each [sic] are charter amendments. Measures A and B were placed on the ballot to counter Measure C which the Board of Supervisors unanimously opposes. Sounds complicated? It is. That is why I am sending you the Mercury News editorial published on October 3 that simply and clearly defines the issues. You can also reference your sample ballot for arguments for and against the measures. Please take the time to educate yourself and your neighbors on these complex issues." The e-mail provides contact information for those "interested in volunteering at the polls," and it closes with an invitation to provide feedback.

The attached editorial advocates defeat of Measure C and passage of Measures A and B. It refers to Measure C as a "power play" by unions and states: "After years of bitter labor disputes, some Santa Clara County government employee unions are appealing to voters to give them more clout in contract negotiations. County supervisors are fighting back with two ballot measures of their own." The editorial provides further commentary on the measures. It also includes a box with a summary of the three measures.

2. *Substantial evidence supports the determination that the e-mail's text was informational.*

a. *Express advocacy*

Plaintiffs make no claim that the text of the e-mail constitutes express advocacy. Nor would such a claim succeed. The e-mail itself simply encourages the recipients to educate themselves about the three initiative measures and suggests where information can be found. It does not unambiguously urge defeat of Measure C or passage of Measures A and B.

b. *Style and tenor*

The text of the e-mail explains that there are three local initiative measures on the ballot, encourages recipients to educate themselves about the three measures, and refers to the attached editorial and to the sample ballot as sources of further information.

The trial court found the e-mail to be neutral in tone. That determination is supported by substantial evidence, both testimonial and documentary.

Called as an expert witness by the County, Agnos was asked: "Did you view the Blanca Alvarado e-mail as informational or campaign activity?" He responded: "In my opinion it was clearly informational because it describes the measures. It told them where they could get more information and included an editorial that outlined the issues from a local newspaper." While acknowledging that the editorial urged defeat of Measure C, Agnos noted: "But it also included a very specific box that outlined the three measures that were on the ballot, I think A, B, and C, and the components."

In addition to that testimony, the e-mail itself was in evidence at trial. A review of its text demonstrates that it was "moderate in tone and did not exhort voters with regard to how they should vote." (*Vargas, supra*, 46 Cal.4th at p. 39.) Its tone makes the e-mail text "readily distinguishable from traditional campaign material." (*Ibid.*)

This testimonial and documentary evidence supports the determination that the e-mail text reflected a neutral style and tenor.

c. *Timing*

The Alvarado e-mail was sent on October 8, 2004, less than a month before the November 5th election. According to plaintiffs, "the timing of the e-mail flags it as advocacy." Considering the e-mail text alone, we disagree.

As the *Vargas* court observed, "under some circumstances the mailing of material relating to a ballot measure to a large number of potential voters shortly before an upcoming election unquestionably would constitute campaign activity that may not properly be paid for by public funds . . . ." (*Vargas, supra,* 46 Cal.4th at p. 38; see *Keller, supra,* 47 Cal.3d at p. 1172 [packet sent "approximately one month" before election was improper campaign activity].) But under other circumstances, material distributed close in time to an election may nevertheless be informational.

At issue in *Vargas* was a city newsletter mailed on October 1, 2002, approximately a month before the November 5 election. (*Vargas, supra,* 46 Cal.4th at pp. 12, 13.) Rejecting the plaintiffs' claim that the timing demonstrated that the city engaged in improper advocacy, the court cited "a number of factors support[ing] the conclusion that the City's mailing of the newsletter here at issue constituted informational rather than campaign activity." (*Id.* at p. 38.) Among those factors were tone and content. (*Id.* at p. 39.) Additionally, the court found it "significant that this particular newsletter was a regular edition of the City's quarterly newsletter that as a general practice was mailed to all city residents, rather than a special edition created and sent to would-be voters, specifically because of the upcoming election regarding Measure O." (*Id.* at p. 38.)

In this case, as in *Vargas,* several factors support the conclusion the e-mail text represents permissible informational activity, rather than impermissible campaign activity. (*Vargas, supra,* 46 Cal.4th at p. 38.) Two such factors are its tone and content, discussed above. (*Ibid.*) Another is the fact that the e-mail was one in a series of regular communications distributed as "an e-mail blast" to the recipients in the database. (*Ibid.*) Considering its style, tenor, and timing, we agree with the trial court's determination that the text of the e-mail is informational.

The attached editorial compels a different analysis, however, as we now explain.

### 3. *Substantial evidence supports the determination that the attached editorial constituted advocacy.*

As the trial court recognized, the editorial attached to the Alvarado e-mail expressly advocates against Measure C. That characterization is supported by the evidence and by the law. The editorial begins: "COUNTY FACES POWER PLAY BY UNIONS; [¶] VOTE NO on C." The editorial exhorts the voters to "reject Measure C, which is the union proposal, and vote for Measures A and B, which are the supervisors' attempt to restore balance and guard the public interest."

Under regulations promulgated by the Fair Political Practices Commission, "A communication 'expressly advocates' the nomination, election or defeat of a candidate or the qualification, passage or defeat of a measure if it contains express words of advocacy such as 'vote for,' 'elect,' 'support,' 'cast your ballot,' 'vote against,' 'defeat,' 'reject,' 'sign petitions for' or otherwise refers to a clearly identified candidate or measure so that the communication, taken as a whole, unambiguously urges a particular result in an election." (Cal. Code Regs., tit. 2, § 18225, subd. (b)(2).) The editorial employs terms specifically identified in the regulation as words of express advocacy.

Despite the fact that the attachment unquestionably constitutes express advocacy, it falls within the statutory provision exempting certain campaign activity, as the trial court correctly concluded.

### 4. *The attachment falls within the statutory exemption.*

In rejecting plaintiffs' challenges to the e-mail, the trial court applied the statutory exemption found in section 8314. In doing so, the court cited both Alvarado's "intent . . . to inform the recipients on the differences between Measures A, B, and C on the November 2004 ballot" and the minimal costs involved in sending the e-mail and attachment.

#### a. *Intent*

As plaintiffs aptly observe, there is no authority suggesting that the communicator's intent enters into the determination of whether a communication constitutes advocacy. On the other hand, however, the statutory exemption does cover "the referral of unsolicited political mail, telephone calls, and visitors to private political entities." (§ 8314, subd. (b)(2).)

In this case, there was testimony from Alvarado's chief of staff, Cunningham, about the supervisor's reasons for attaching the editorial. Cunningham testified that Alvarado's decision was prompted by concern over voter confusion, which had been expressed by a number of people. According to Cunningham, Alvarado included the editorial because she thought that it contained a good explanation of the three measures.

The parties do not address whether the editorial's inclusion constitutes a referral "to private political entities." (§ 8314, subd. (b)(2).) But we need not resolve that question, given our determination that any use of public resources was minimal.

#### b. *Minimal use of public resources*

Concerning the use of public resources to send the e-mail, the court heard testimony from two witnesses, the first being Cunningham, who prepared and

distributed the e-mail at Alvarado's direction. Cunningham testified that she created the text of the e-mail in about 10 minutes during her lunch period and that she distributed the e-mail once, with the push of a button. There was also testimony on this point from Agnos, who explained: "It really was insignificant in the sense that an e-mail to 1500 people once you hit the button and prepare it is instantaneous." Agnos described the cost of the e-mail as "decimal dust."

In light of this evidence, the court properly determined that "the expenditure was minimal." That determination supports the court's application of the statutory exemption for "incidental and minimal use of public resources, such as equipment or office space," used for campaign activity. (§ 8314, subd. (b)(2).) It also supports the conclusion that there was no "use" of public resources as statutorily defined, since there was neither a gain to Alvarado nor a loss to the County "for which a monetary value may be estimated." (§ 8314, subd. (b)(4).)

In reaching this conclusion, we are cognizant that technological advances permit the easy distribution of information with a negligible expenditure of employee time, using equipment such as computers and telephones that are already in place. (See § 8314, subd. (b)(1) [allowing "the incidental and minimal use of public resources, such as equipment or office space, for personal purposes, including an occasional telephone call"].) Our decision should not be read as sanctioning the use of public resources for advocacy, however easily that may be accomplished using today's technology. But on the record presented here, under section 8314, any use of public resources was minimal.

### 5. *There was no* Stanson *violation.*

For a *Stanson* violation to occur, "public funds" must be expended "to promote a partisan position in an election campaign." (*Stanson, supra,* 17 Cal.3d at pp. 209–210.) "In the absence of some evidence [that] creation of the text involved the expenditure of public funds in some manner, its political tone is irrelevant." (*League of Women Voters, supra,* 203 Cal.App.3d at p. 559.)

As just explained, the evidence shows that any expenditure of public resources was de minimis. (See *Keller, supra,* 47 Cal.3d at p. 1171 [State Bar president's "speech itself, of course, cost the State Bar nothing"].) That being so, this record presents no *Stanson* violation.

### SUMMARY OF CONCLUSIONS

I. The County did not violate *Stanson* in its labor negotiations. First, the MMBA authorized the County's discussion of binding interest arbitration

at the bargaining table, despite the fact that it was presented as a voter initiative rather than a contract clause. Second, substantial evidence supports the trial court's determination that there was no quid pro quo arrangement of higher pay for the unions' political silence. Finally, the County did not engage in impermissible campaign activity by discussing the initiative measure in its labor negotiations with the unions.

II. The supervisor's e-mail did not violate *Stanson*. Substantial evidence supports the determination that the text of the e-mail was informational. Furthermore, any expenditure in preparing and distributing the e-mail with its attachment was minimal.

## DISPOSITION

The judgment is affirmed.

Duffy, J., concurred.

**MIHARA, Acting P. J.,** Concurring and Dissenting.—Appellants are taxpayers who filed a complaint against the County of Santa Clara (the County) for declaratory and injunctive relief coupled with a petition for a writ of mandate or prohibition. Appellants sought a declaration that the County had violated *Stanson v. Mott* (1976) 17 Cal.3d 206 [130 Cal.Rptr. 697, 551 P.2d 1] (*Stanson*) and an injunction barring such conduct in the future. Appellants alleged that the County had illegally used public funds for partisan electoral purposes in connection with a proposed local ballot measure that would have mandated interest arbitration of labor disputes between the County and the unions representing the County's employees.[1] Although appellants obtained a preliminary injunction in October 2004, the County prevailed at the 2007 trial.

Appellants contend that the trial court erred in (1) finding that the County was obliged to "meet and confer" with the unions about the proposed ballot measure, (2) concluding that the County had not offered a "quid pro quo" to the unions of better contracts in exchange for the unions not supporting the proposed ballot measure, and (3) determining that the actions of a County supervisor in sending out an e-mail regarding the ballot measure did not amount to the use of public funds for partisan electoral purposes.

Our standard of review is well settled. The trial court's decision on the propriety of granting declaratory or injunctive relief is reviewed for abuse of

---

[1] "Interest arbitration involves an agreement between an employer and a union to submit disagreements about the proposed content of a new labor contract to an arbitrator or arbitration panel." (*City of Fresno v. People ex rel. Fresno Firefighters* (1999) 71 Cal.App.4th 82, 96 [83 Cal.Rptr.2d 603].)

discretion (*Hannula v. Hacienda Homes* (1949) 34 Cal.2d 442, 448 [211 P.2d 302] [declaratory relief]; *Salazar v. Eastin* (1995) 9 Cal.4th 836, 850 [39 Cal.Rptr.2d 21, 890 P.2d 43] [injunctive relief]), but its underlying factual determinations are reviewed for substantial evidence (*Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 912 [117 Cal.Rptr.2d 631]), and its resolution of legal issues is subject to de novo review (*City of Los Angeles v. Los Olivos Mobile Home Park* (1989) 213 Cal.App.3d 1427, 1431 [262 Cal.Rptr. 446]).

Appellants contend that the County violated *Stanson* by seeking during labor negotiations to obtain a commitment by the unions not to support the proposed ballot measure. *Stanson* does not support this contention. In *Stanson*, Mott was the Director of the Department of Parks and Recreation, and he allegedly authorized the expenditure of $5,000 to promote a bond measure that had been placed on the ballot by the Legislature. (*Stanson, supra*, 17 Cal.3d at p. 209.) Stanson sued Mott, but Stanson's action was dismissed on demurrer. (*Ibid.*) On appeal, the California Supreme Court held that Stanson was entitled to pursue his allegations because, "at least in the absence of clear and explicit legislative authorization, a public agency may not expend public funds to promote a partisan position in an election campaign . . . ." (*Stanson*, at pp. 209–210.)

The County argues that *Stanson* did not prohibit it from negotiating with the unions regarding the proposed ballot measure because such negotiations were *legislatively authorized* by the Meyers-Milias-Brown Act (the MMBA) (Gov. Code, § 3500 et seq.). The MMBA required the County to "meet and confer in good faith regarding wages, hours, and other terms and conditions of employment with" the public employee unions. (Gov. Code, § 3505.) Appellants concede that "[i]nterest arbitration measures" are a *permissible* subject of collective bargaining, but they contend that this subject matter was off-limits during the County's negotiations with the unions because the proposed ballot measure was under consideration at that time. The trial court found that *Stanson* did not apply because the MMBA authorized the County to negotiate with the unions regarding the proposed ballot measure.

The question of whether the MMBA authorized the County to negotiate with the unions regarding the proposed interest arbitration ballot measure is a question of law, and I agree with the trial court that the MMBA provides such authorization. It is inconceivable that the County would be precluded from including in its labor negotiations with the unions the subject of a proposed ballot measure· on interest arbitration when the potential passage of such a measure could be expected to substantially impact the County's future relationship with the employees represented by the unions. Where a public agency's actions are legislatively authorized, the fact that the agency's

actions are related to a proposed ballot measure does not establish a violation of *Stanson*; such actions fall within the express exception to *Stanson*'s general rule. (*Stanson, supra,* 17 Cal.3d at pp. 209–210.)

Appellants contend that, even if the County was authorized to *discuss* the proposed ballot measure with the unions, the County was prohibited from offering the unions a "quid pro quo" of better contracts in exchange for the unions not supporting the proposed ballot measure. The trial court made a factual finding that there *was no quid pro quo* as the County did not sweeten the terms of its proposals to the unions in order to obtain the unions' agreements not to support the proposed ballot measure. Appellants acknowledge that we review this finding for substantial evidence, but they contend that it is not supported by substantial evidence because the testimony which supports it is implausible. Since the trial court's finding is supported by trial testimony which was not inherently incredible, I agree with my colleagues that the trial court's finding is supported by substantial evidence that there was no quid pro quo and therefore must be upheld.

Finally, appellants maintain that the preparation and dissemination of the e-mail from County Supervisor Blanca Alvarado violated both Government Code section 8314 and *Stanson.*

Kristina Cunningham, Alvarado's chief of staff, testified at trial that, a month before the election, Alvarado asked her to prepare the e-mail and attach to it an editorial urging voters to vote no on the interest arbitration ballot measure. Cunningham told Alvarado that she would "check with Ann [Ravel, the county counsel]" about the propriety of the e-mail. Cunningham telephoned Ravel and spoke to her for "just a few minutes" about the e-mail. Cunningham spent about 10 minutes preparing the e-mail. Cunningham then printed out the e-mail and the attachment and took them to Ravel's office so that Ravel could review them before the e-mail was sent. Cunningham returned to her office and "put [the e-mail] out" during a period of time that "could be called my lunchtime." She sent the e-mail to 1,500 recipients, most, if not all, of whom were County voters. The trial court found that Alvarado's e-mail "was an incidental and minimal use of public resources, and did not constitute a violation of Government Code section 8314" and also did not violate *Stanson.*

Government Code section 8314 provides: "(a) It is unlawful for any elected state or local officer, including any state or local appointee, employee, or consultant, to use or permit others to use public resources for a campaign activity, or personal or other purposes which are not authorized by law. [¶] (b) For purposes of this section: [¶] (1) 'Personal purpose' means those activities the purpose of which is for personal enjoyment, private gain or

advantage, or an outside endeavor not related to state business. 'Personal purpose' does not include the incidental and minimal use of public resources, such as equipment or office space, for personal purposes, including an occasional telephone call. [¶] (2) 'Campaign activity' means an activity constituting a contribution as defined in Section 82015 or an expenditure as defined in Section 82025. 'Campaign activity' does not include the incidental and minimal use of public resources, such as equipment or office space, for campaign purposes, including the referral of unsolicited political mail, telephone calls, and visitors to private political entities. [¶] (3) 'Public resources' means any property or asset owned by the state or any local agency, including, but not limited to, land, buildings, facilities, funds, equipment, supplies, telephones, computers, vehicles, travel, and state-compensated time. [¶] (4) 'Use' means a use of public resources which is substantial enough to result in a gain or advantage to the user or a loss to the state or any local agency for which a monetary value may be estimated." (Gov. Code, § 8314.)

Because appellants contend that the preparation and dissemination of the e-mail was "campaign activity" within the meaning of Government Code section 8314, the validity of their contention necessarily rests on the premise that Alvarado "use[d] or permit[ted] others to use public resources for a campaign activity" within the very limited definition of "campaign activity" set forth in Government Code section 8314, subdivision (b)(2).[2] "(b) For purposes of this section [Government Code section 8314]: [¶] . . . [¶] (2) *'Campaign activity' means an activity constituting a contribution as defined in Section 82015 or an expenditure as defined in Section 82025.*" (Gov. Code, § 8314, subd. (b)(2), italics & underscoring added.) Government Code section 82015 provides: " 'Contribution' means a payment, a forgiveness of a loan, a payment of a loan by a third party, or an enforceable promise to make a payment except to the extent that full and adequate consideration is received, unless it is clear from the surrounding circumstances that it is not made for political purposes." (Gov. Code, § 82015, subd. (a).) Government Code section 82025 provides: " 'Expenditure' means a payment, a forgiveness of a loan, a payment of a loan by a third party, or an enforceable promise to make a payment, unless it is clear from the surrounding circumstances that it is not made for political purposes." (Gov. Code, § 82025.)

No evidence was produced at trial that the preparation and dissemination of the e-mail, which appellants claim was "campaign activity," was a "payment" of any kind, a "forgiveness of a loan," or a "promise to make a payment." Hence, the preparation and dissemination of the e-mail did not fall within the very exclusive definition of "campaign activity" to which Government Code section 8314 applies. Consequently, the trial court did not

---

[2] Appellants do not contend on appeal that Alvarado used public resources for "personal or other purposes which are not authorized by law." (Gov. Code, § 8314, subd. (a).)

err in rejecting appellants' contention that the preparation and dissemination of the e-mail violated Government Code section 8314.

However, appellants' contention that the trial court erred in finding no *Stanson* violation has merit.

Nothing in *Stanson* or its progeny permits the expenditure of even a minimal amount of public funds for campaign purposes. My colleagues assert that *Stanson* does not apply to de minimis expenditures, but the cases they cite do not support that proposition. "[The] uniform judicial reluctance to sanction the use of public funds for election campaigns rests [on] an implicit recognition that such expenditures raise potentially serious constitutional questions. A fundamental precept of this nation's democratic electoral process is that the government may not 'take sides' in election contests or bestow an unfair advantage on one of several competing factions. A principal danger feared by our country's founders lay in the possibility that the holders of governmental authority would use official power improperly to perpetuate themselves, or their allies, in office (see, e.g., Madison, The Federalist Papers, Nos. 52, 53; 10 Richardson, Messages and Papers of the Presidents (1899) pp. 98–99 (President Jefferson)); the selective use of public funds in election. campaigns, of course, raises the specter of just such an improper distortion of the democratic electoral process." (*Stanson, supra,* 17 Cal.3d at p. 217.) "[T]he use of the public treasury to mount an election campaign which attempts to influence the resolution of issues which our Constitution leave to the 'free election' of the people (see Cal. Const., art. II, § 2) does present a serious threat to the integrity of the electoral process." (*Stanson,* at p. 218.) Thus, *any* use of public funds to favor one side in an electoral contest is improper because it threatens the integrity of the process.

The trial court found that there was no *Stanson* violation because the style, tone, and timing of the e-mail reflected that the e-mail was primarily informational. The evidence does not support this finding. The e-mail stated the County's opposition to the ballot measure and attached an editorial opposing the passage of the measure. The dissemination of an editorial opposing a ballot measure can hardly be deemed merely informational rather than advocative. Indeed, *Stanson* explicitly identified "dissemination, at public expense, of campaign literature prepared by private proponents or opponents of a ballot measure" as a "campaign" activity rather than an "informational" activity. (*Stanson, supra,* 17 Cal.3d at p. 221.)

Cunningham's testimony established beyond dispute that some minimal level of public funds was expended on this e-mail. After discussing the e-mail with Alvarado, Cunningham spent 10 minutes of her worktime preparing the e-mail, and Ravel devoted at least a few minutes to discussing the e-mail with

Cunningham and reviewing it after Cunningham had prepared it. While Cunningham testified that she actually "put it out" during her lunchtime, this was a reference to the time when she actually sent the e-mail. Her discussion with Alvarado, her preparation of the e-mail, and Ravel's conversation with Cunningham and review of the e-mail clearly occurred during compensated worktime, and the e-mail was sent through the County's computer system. While the public funds expended in connection with the e-mail might have been only a small amount, the undisputed evidence established that some amount of public funds *was expended* for the purpose of opposing the ballot measure. It follows that the preparation and dissemination of the e-mail violated *Stanson*, and, at the very least, appellants were entitled to declaratory relief to that effect. (*Stanson, supra*, 17 Cal.3d at p. 223.) Whether injunctive relief is merited because "similar expenses are threatened in the future" is an issue that I would have the trial court consider on remand. (*Stanson*, at p. 223.)

I would reverse the trial court's judgment and remand with directions to the trial court to grant declaratory relief stating that the e-mail was a *Stanson* violation and to reconsider whether appellants are entitled to injunctive relief in regard to that claim.

A petition for a rehearing was denied February 18, 2010, and the opinion was modified to read as printed above. Mihara, J., was of the opinion that the petition should be granted. Appellants' petition for review by the Supreme Court was denied May 12, 2010, S180673.