Filed 4/12/16  P. v. Hardeman CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DENNIS WAYNE HARDEMAN, JR.,<br><br>    Defendant and Appellant. | D069464<br><br><br><br>(Super. Ct. No. FVI1301305) |
| In re DENNIS WAYNE HARDEMAN, JR.,<br>on Habeas Corpus. | D069465 |


APPEAL from a judgment of the Superior Court of San Bernardino County, Eric M. Nakata, Judge, and petition for writ of habeas corpus.  Judgment affirmed; petition denied.


Ronda G. Norris, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlston and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

In 2014, a jury convicted Dennis Wayne Hardeman, Jr., of one count of premeditated murder, two counts of attempted premeditated murder, and one count of being a convicted felon in possession of a firearm. (Pen. Code, §§ 187, subd. (a), 664, 29800, subd. (a).)[1] The jury further found all special allegations regarding gun use and great bodily injury to be true. (§§ 12022.53, subds. (c)-(d), 12022.7, subd. (a).) The charged crimes involved the shooting of three people on September 20, 2012, and the People relied on eyewitness identification evidence to obtain Hardeman's convictions. In a previous trial on the same counts (the "first trial"), a mistrial was declared.

Hardeman appeals, contending the identification evidence adduced at trial was inherently improbable and insufficient to support his convictions. He further contends his trial counsel was ineffective for, inter alia, not introducing certain affirmative and impeachment evidence that was introduced during the first trial. He raises the same grounds regarding ineffective assistance of counsel in a petition for writ of habeas corpus, which we have consolidated with this appeal. For reasons we will explain, the judgment is affirmed and the habeas petition is denied.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

PROCEDURAL AND FACTUAL BACKGROUND

The first trial was held in June 2013, and Hardeman was represented by counsel, David Sanders. The trial resulted in a hung jury, with 11 of the 12 jurors inclined toward finding Hardeman guilty. One juror thought that the holdout juror "displayed some kind of bias" and he "simply would not consider or accept some circumstantial evidence" accepted by the other 11 jurors. The court declared a mistrial. The second trial, or the one resulting in Hardeman's convictions, began in March 2014 with Hardeman represented by new counsel, James Terrell.[2] We recite the evidence from the second trial in the light most favorable to the jury's verdicts.

The shooting victims were Alexander Long, Terrell Anderson, and Gerald Scrutchins. Long and Anderson survived numerous gunshot wounds, and Scrutchins died. Long's and Anderson's accounts of the shootings were similar and supported that Long had the opportunity to identify, and he immediately recognized, the shooter.

Long testified he first met Hardeman in August 2011. Hardeman ran a "business" of obtaining marijuana and collecting cash from the drug sales; Long distributed marijuana for him. In a September 2012 conversation, Long told Hardeman that he no longer wanted to sell marijuana for him because Long was not profiting or making any money from it. Long had contemplated the idea of selling marijuana without Hardeman, but he did not have an independent source. Hardeman became angry and upset with

---

[2] After the first trial, Hardeman expressed to the court that he was highly dissatisfied with Sanders for not introducing certain evidence, and Hardeman wanted to represent himself. The court held a *Marsden* hearing. (*People v. Marsden* (1970) 2 Cal.3d 118.) Prior to the second trial, new counsel was appointed for Hardeman.

Long.  Whether spoken or unspoken, they began avoiding each other and were supposed to stay out of each other's neighborhoods.

About a week after conversing, the two had a confrontation.  Long was at an apartment across the street from his house, and Hardeman showed up there—an action Long considered an affront because Hardeman was not supposed to be in the neighborhood.  They verbally argued, and Hardeman suggested that they fight, but Long declined.

On September 20, 2012, at about 10:00 p.m., Long was in his house at "apartment A" on Mohawk Road.  His buddy, Anderson, had fallen asleep on the couch in the living room.  Long had a marijuana cigar to smoke, and he woke Anderson to join him.  Long and Anderson went outside to the garage of "apartment B" next door, where Scrutchins was playing music.  Scrutchins had been visiting at apartment B that day.  Long, Anderson, and Scrutchins began hanging out, talking, and drinking, with dominoes set out for play.  They sat down, preparing to smoke.  Long looked at his cell phone on a nearby table, saw it was 11:00 p.m., and thought briefly about calling his daughter's mother.[3]  He decided not to call her because they had been fighting all day.  Instead, he lit up his cigar, started smoking, and moved to pass the cigar on.  At that moment, he heard gunshots.

The garage door was open, and the garage was well lit inside from an overhead light and a table lamp.  Long and Anderson were sitting with their backs toward the

---

3       The phone was Long's mother's phone, but he was using it.

garage door, while Scrutchins sat opposite them, facing outside. The shooter approached from outside and kept advancing until he was in the garage. Scrutchins was hit first, and he fell down. Long and Anderson rose from their seats, ran into each other as they tried to get away, and were both shot. Anderson testified he collapsed because his right leg had been shot and shattered. Long was then shot five times up and down the leg, including the back of his thigh. Long fell and his body somewhat overlapped Anderson's on the ground. Anderson tried to push up and was instantly shot in the left arm. Long was able to use his right arm to push his body, prop himself up, and move into a sitting position with his legs in front of him. He immediately recognized Hardeman as the person who came into the garage. Hardeman aimed a gun at Long's face, and began shooting at his head from three or four feet away. Long used his left hand to block his face, suffered three gunshot wounds to his hand, and gunshot wounds to the left side of his head. Hardeman ran off. The entire shooting incident happened quickly.

The following sequence of events is based on the recollection of Long and Anderson, as well as three additional people who were inside apartment B at the time of the gunshots.[4] Long managed to make his way inside apartment B after being shot 10 times. He left a trail of blood drops in the apartment hallway as he walked to Q's back bedroom trying to get help, eventually got a wet towel, and wrapped it around his head. Meanwhile, a woman, Shavon, ran out of the garage. One man closed the garage door

---

[4] The three additional witnesses, Alfonzo Parker, Brittany Jackson, and Ivan Wilson, were not friends with Long or Anderson; two of them were just visiting. Apartment B's usual residents were a woman referred to as "Q" or "Queen" and Q's three young daughters.

after Shavon ran out, and then dragged Scrutchins's body inside the apartment; Scrutchins was nonresponsive. Anderson, having suffered three bullet wounds, "crawled into" the apartment last after Scrutchins. Another man primarily checked on the children present inside the home and then stayed in a room with them. Long believed at least 10 minutes passed after the shots had ended before he called 911.

The three trial witnesses who were inside of apartment B at the time of hearing gunshots could not pinpoint the time of the shootings or the time that 911 was called. One man estimated that he woke up to the shots "after 10:30 [p.m.]." One woman could only estimate that she was inside apartment B at "10:00 [p.m.]," and about 15 minutes later, she heard gunshots. Another man estimated the shootings occurred by "10:55 [p.m.]." Anderson estimated that the shootings began around 10:40 p.m. As noted above, Long thought that the shots occurred at 11:00 p.m., and that he called police 10 minutes or more after the last shot. Other apartment B witnesses believed that they called 911 "immediately" after the gunshots ended, or within "seconds" or a minute, or after helping Long get a towel on his head. The investigating officer and homicide detective, Gerald Davenport, testified that the first 911 call came in at 11:09 p.m., then at 11:10 p.m., and so forth, and multiple 911 calls were received. The third 911 call was from the victims.

Police began responding to, and investigating, the shooting incident. The first responding deputy sheriff testified that Long was emotional and hysterical when she met him at the crime scene around 11:15 p.m., and Long told her that Hardeman had shot

6

him.  Likewise, Anderson told a different responding officer that Hardeman was the shooter.

The day after, Hardeman allowed himself to be interviewed by Detective Ryan Ford.  During this interview, Hardeman denied being the shooter and provided a detailed account of his activities.  He gave the detective his precise walking path around 11:00 p.m. the night before, claimed to have gotten dressed at his house before setting out on his walk, and volunteered that he could be found on a 7-Eleven store's surveillance camera where he purchased a hot dog and a cherry soda.  Hardeman told Detective Ford that he should be on the surveillance video because Long had once been recorded on the same camera and had been able to avoid robbery charges by using the surveillance footage.  Hardeman also said he met up with "Shorty the Don" after his purchase at the store, and got a ride to the house of his friend, Special Williams, on Iroquois Road.

Shorty the Don (aka Antonio Parker) recalled seeing Hardeman the night of the shooting at around 9:00 p.m. (not later); Hardeman had been "passing by" and asked for a ride.  Parker's girlfriend ultimately gave Hardeman a ride in exchange for some gas money.  Hardeman was dressed up at the time in black slacks with curled hair, like he was going to a club.  Williams testified that although she could not recall the exact date, there was one evening in September 2012 when Hardeman came to her house on Iroquois Road at around midnight, dressed up as if for a club or church.  As Hardeman was stepping into a loft area in her house that night, Williams observed a gun in the back of Hardeman's pants.  Two days after that night of seeing Hardeman with a gun, Williams learned that he had been involved in a shooting incident.

7

Officers obtained surveillance video footage from 7-Eleven, as well as a Jack in the Box located near it. Video clips were played for the jury at trial. Detective Davenport testified that the Jack-in-the-Box had only one surveillance camera, and Hardeman would not have been recorded on the camera had he been walking in the direction that he told officers he had been walking. Hardeman can be seen crossing the restaurant's camera view at about 30 seconds after 11:03 p.m., not fully dressed, with his shirt draped over him, as if in the process of changing. Several minutes later, he is observed inside the 7-Eleven as captured on its surveillance video, and can be seen leaving it before 11:15 p.m.

Detective Davenport believed Hardeman had purposely sought to be recorded on a surveillance video—the same one that he knew Long had been recorded on in the past—to create an alibi after shooting the victims at 11:00 p.m. The detective had done two test drives from the crime scene on Mohawk Road to the business area at the cross streets of Bear Valley Road and Navajo Road (where Jack in the Box and 7-Eleven were located), a distance of about one and one-half miles. He completed the drive in three minutes and 18 seconds following posted signs and speed limits, and less than one minute without following speed limits. Thus, the detective believed Hardeman could have committed the shootings at 11:00 p.m.

In addition, officers found 14 cartridge casings at the crime scene, outside and inside apartment B's garage, consistent with witnesses' statements. All the bullets were fired from the same gun. An autopsy revealed that Scrutchins had been shot three times

8

and died from a fatal gunshot wound to his trunk. Long's and Anderson's gunshot wounds were consistent with their recollection of how they were fired upon.

Two days after being shot, Anderson informed detectives that Hardeman was the shooter, and identified him in a photographic lineup. Between then and trial, Anderson told Detective Davenport several times that he was scared for his and his family's safety if he had to testify against Hardeman. At trial, Anderson testified that he had not gotten a clear view of the shooter and could not confirm it was Hardeman; he stated that he had previously been relying on Long's emphatic declaration moments after the shooting that Hardeman was the shooter.

The defense presented an expert witness on the unreliability of eyewitness identifications. The expert testified regarding many factors that reduce people's accuracy in perception, including lighting, distance, time, stress, etc. Conversely, the expert testified that a witness who identifies someone "right away" after an incident is more likely to be making an accurate identification. Further, people are generally better at accurately identifying someone within their same race and age range.

DISCUSSION

I.      *Inherently Improbable Testimony*

Hardeman contends the evidence was insufficient to establish him as the shooter. He acknowledges Long identified him as the shooter, and the testimony of a single witness is ordinarily sufficient to establish any given fact. However, Hardeman argues that Long's identification of him was "inherently improbable" in light of other evidence. We disagree.

9

To reject statements given by a witness who has been believed by a trial court, the statements' truth must be physically impossible or their falsity must be apparent without resorting to inferences or deductions. (*People v. Huston* (1943) 21 Cal.2d 690, 693.) "The inherently improbable standard addresses the basic content of the testimony itself— i.e., could that have happened?—rather than the apparent credibility of the person testifying." (*People v. Ennis* (2010) 190 Cal.App.4th 721, 729.) It is not a proper appellate court function to reassess witness credibility, reweigh evidence, or resolve inconsistent evidence. (*People v. Thompson* (2010) 49 Cal.4th 79, 125.) Reversing judgments based on inherently improbable testimony is "so rare as to be almost non-existent." (*Ennis,* at p. 728.)

Nothing about the eyewitness identification evidence in this case is inherently improbable or incredible. Long testified that Hardeman shot him at 11:00 p.m. because he had looked at his phone right before he heard gunshots. Detectives developed a coherent theory that, after shooting the victims, Hardeman drove to a nearby business area and placed himself on a surveillance video to create an alibi. Conflicting evidence about the time of the gunshots does not render Long's testimony physically impossible or facially false.

Hardeman argues that Long's testimony of nine or 10 minutes passing until he called 911 is "simply not believable." We reject any attempt to reargue the evidence on appeal. (*People v. Thompson, supra*, 49 Cal.4th at p. 125; *DiQuisto v. County of Santa Clara* (2010) 181 Cal.App.4th 236, 261 [rejecting claim of "inherently unbelievable" testimony].) "Conflicts and even testimony which is subject to justifiable suspicion do

10

not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends."  (*People v. Huston*, *supra*, 21 Cal.2d at p. 693.)  Long's statement is physically possible, and the jury chose to believe him.  Substantial evidence supports Hardeman's convictions.

## II.     *Ineffective Assistance of Counsel*

On appeal and in his subsequently filed habeas corpus petition, Hardeman asserts he was denied effective assistance of counsel.  The petition relies principally on evidence contained in the appellate record, and further attaches a declaration of appellate counsel, a list of unanswered questions asked by appellate counsel of Terrell concerning his reasons for not taking certain actions at trial, a declaration of Sanders, and a CD of four recorded 911 calls.[5]  In October 2015, a court ordered the petition to be considered with the appeal for the sole purpose of determining whether an order to show cause (OSC) should issue.  The People filed an informal letter brief to address whether an OSC should issue, and Hardeman filed a response.

Given the procedural posture, we inquire whether Hardeman's habeas petition states a prima facie case for relief.  (*People v. Romero* (1994) 8 Cal.4th 728, 737.)  He claims he did not receive effective assistance of counsel on the following general

---

[5]     Hardeman's petition, a document entitled "Verification," and his appellate counsel's declaration, are all unsigned.  Although the lack of a signed verification is a sufficient basis to deny a petition for writ of habeas corpus, we will not deny the petition on that ground.  (§ 1474; *People v. Manson* (1976) 61 Cal.App.3d 102, 169 ["We note the absence of verification of the petition and that it could have been rejected on that basis alone."].)

11

grounds: (1) Terrell did not call the same witnesses as were called in his first trial, which resulted in a hung jury; (2) Terrell did not effectively elicit evidence available from the first trial regarding the timing and number of 911 calls, and he did not object to certain prosecutorial statements made in closing argument; (3) Terrell did not effectively cross-examine or impeach Long with certain evidence; and (4) Terrell did not effectively impeach Special Williams with certain evidence.

To establish a claim of ineffective assistance of counsel, a defendant must demonstrate "(1) counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation prejudiced the defendant, i.e., there is a 'reasonable probability' that, but for counsel's failings, defendant would have obtained a more favorable result. " (*People v. Dennis* (1998) 17 Cal.4th 468, 540-541, citing, among others, *Strickland v. Washington* (1984) 466 U.S. 668.) " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*People v. Bolin* (1998) 18 Cal.4th 297, 333.)

In evaluating trial counsel's actions, "[a] court must indulge a strong presumption that counsel's acts were within the wide range of reasonable professional assistance." (*People v. Dennis, supra,* 17 Cal.4th at p. 541.) "Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." (*People v. Bolin, supra*, 18 Cal.4th at p. 333.) "Where the record on appeal sheds no light on why counsel acted in the manner challenged, we will affirm unless counsel was asked for an explanation and failed to provide one or unless there simply could be no

12

satisfactory explanation for the action [or omission]." (*People v. Jimenez* (1992) 8 Cal.App.4th 391, 397, citing *People v. Lewis* (1990) 50 Cal.3d 262, 288.)

We conclude that a "satisfactory explanation" exists for counsel's actions, and the record shows why he would have reasonably chosen to omit the asserted evidence from the second trial. (*People v. Pope* (1979) 23 Cal.3d 412, 425 ["where the record shows that counsel's omissions resulted from an informed tactical choice within the range of reasonable competence, the conviction must be affirmed"].) The trial court ordered transcripts from the first trial to be available to Hardeman and his new counsel prior to the second trial, and we likewise have the benefit of both trials' transcripts. We are not persuaded by Hardeman that his first trial's hung jury necessarily shows that his second trial counsel committed prejudicial errors. According to the judge who presided over both trials, there was not "much difference at all" between the two trials, and by the end of the second trial, 23 jurors were inclined to, or did in fact, find Hardeman to be guilty. With knowledge of the first trial's outcome, it was not unreasonable for Terrell to try a different approach as we discuss below.

1.      *Witnesses Outside of Apartment B*

Hardeman contends his counsel was ineffective for not calling certain witnesses outside of apartment B who testified at his first trial. An examination of the record reveals that none of the asserted witnesses was particularly helpful and some could be detrimental. For example, Terrell is faulted for not calling Miguel Crosthwaite as a defense witness. Crosthwaite lived in "apartment C" on Mohawk Road at the time of the shooting. At the first trial, he testified in pertinent part:

13

"Q  . . . did you see someone shooting?"

[¶] . . . [¶]

"A  Yes."

"Q  And were you able to see their face?"

"A  No, sir."

"Q  Okay.  You were only able to see—could you see what race they were?"

"A  All I really saw was the flash from the gunfire."

"Q  Okay.  Now, could you tell their body shape?"

"A  It looked like an average male."

Crosthwaite was asked whether he had previously described the shooter as "short and stocky."  He responded that he considered "short" to mean "no more than . . . six feet tall," "stocky" meant the shooter was "eating good" or "healthy," and he would "not necessarily" refer to Hardeman as being stocky.  Hardeman is 5 feet 11 inches tall.  When Crosthwaite was asked whether he had told detectives that the shooter was a young black male with braids, he demurred and responded that he only got a "glimpse," things were "a blur," and "I can't really describe the guy too much because I don't really—it was dark."  On cross-examination, Crosthwaite testified unequivocally that he could not identify the shooter and he was not able to see the person's face.  Terrell was not ineffective for declining to call him as a witness.

Hardeman argues another group of witnesses would have established the shootings occurred closer to 11:09 p.m.  However, two of these witnesses, Lucia Mendez and

14

Martha Pazzaro, were actually called by the prosecution at the first trial. Mendez could only estimate the shootings occurred "past 11:00 [p.m.]," while Pazzaro believed the shootings occurred shortly after the 11:00 p.m. news had started. Mendez also heard a car speeding off, which would have supported Detective Davenport's alibi fabrication theory.

Hardeman further argues that Richard Kronjaeger, who lived a couple of blocks away from Mohawk Road and reportedly dialed 911 at 11:09 p.m. after hearing gunshots, should have been a trial witness. At the first trial, Kronjaeger had forgotten the time he called 911, and only knew the information he testified about because defense counsel had refreshed him with his statement to detectives prior to trial. Also, Kronjaeger testified that he suffered from midterm memory issues as a result of posttraumatic stress disorder. Given that he had no present recollection of the timing of his 911 call, the time of the first 911 call was already in evidence, and Kronjaeger experienced issues with remembering things, it was not reasonably probable that his inclusion at the second trial would have yielded a more favorable result.

2.     *Timing and Content of 911 Calls*

Hardeman challenges Terrell's decision not to include the actual 911 calls or to effectively elicit from Detective Davenport that people outside of apartment B had also called 911. He argues such evidence would support the shootings occurred close in time to the first 911 call (around 11:09 p.m.) and that no one heard a getaway car speeding away.

15

Based on our review of the recorded calls and the entire record, we conclude that Terrell's decision not to include the actual calls (or the detailed times and content of each call) was neither objectively unreasonable nor prejudicial. He chose instead to use the calls' absence to argue that the People had not met their burden of proof. Detective Davenport testified that multiple calls came in beginning at 11:09 p.m., and he believed the victims' call was third. In cross-examining the detective and in his closing argument, Terrell pointed out the timing issue in the prosecution's case—how "everyone" apparently waited until a number of minutes after the shootings to call 911. The inhabitants of apartment B indisputably observed the victims' need for emergency medical assistance. Terrell relied on those witnesses' testimony of calling 911 "immediately" or within "seconds" after the gunshots, arguing that there is a natural human impulse to call 911 soon after experiencing "something scary." The jury certainly would have grappled with the issue, and they chose to believe Long's concrete testimony regarding the timing of events.

Omitting the 911 calls from evidence was a tactical choice that Hardeman has not demonstrated to be objectively unreasonable. (See *People v. Beagle* (1972) 6 Cal.3d 441, 458 [judicial hindsight will not ordinarily be exercised on "matters of trial tactics," including choice of witnesses and evidence].) For instance, the first caller on the CD, a woman, states at the outset of her call, "Umm, it's not an emergency, I don't think so. . . ." She reports hearing gunshots and provides her address, which is not on Mohawk Road. Another caller, a man, reports hearing shots "at least a couple blocks away" from his

16

location, thus, he was not in a position to hear any car speeding away.[6] The call from apartment B would not have advanced Hardeman's case even if it served to refresh certain witnesses' recollections. During that call, a man (likely Long) can be clearly heard identifying "Dennis Wayne Hardeman" as the shooter, amidst background chaos and pleas that people are "dying." Accordingly, Hardeman has not demonstrated ineffectiveness by his counsel's omitting the detailed contents of the 911 calls at trial.

Finally, Hardeman argues that Terrell was ineffective for not objecting to a portion of the prosecutor's closing rebuttal argument concerning the calls. As indicated above, Terrell questioned the timing in the prosecution's case, arguing that the People had failed to produce any evidence (like 911 tapes) to sufficiently explain the gap between the shootings and the ensuing 911 calls. The prosecutor responded, in part:

> "[W]hen we're talking about these 911 calls, one, there is no evidence before you to say that there are or are not 911 recordings. There's absolutely no evidence before you of that. There is no evidence before you of what anyone said on the 911 tapes. There is absolutely no evidence before you what anybody did before they called 911. There's absolutely no evidence before you that the times that the people called 911. The dispatch logs that Detective Davenport said were right were accurate. None of that is evidence before you. You know that Alexander Long at 11:00 o'clock looked at his phone. The shots start, and he tells you that he waits probably almost 10 minutes before he calls 911 because of all of these things happen[ing]."

Hardeman argues the jury was led to believe they could not consider Detective Davenport's testimony regarding the times of multiple 911 calls. We disagree. The

---

6      Incidentally, this caller is probably Kronjaeger. Aspects of the call may have been used to impeach him had he been called as a witness.

prosecutor's rebuttal statements are directed to the absence of actual 911 recordings and testimony from people outside of apartment B about the time they called 911, which are true statements. Detective Davenport's testimony was still fair game. Given the context and defense counsel's arguments regarding the timing issues, it is not reasonably likely the jury understood the prosecutor's comments to mean that it should not contemplate when the shootings occurred in relation to the times of 911 calls. (See *People v. Brown* (2003) 31 Cal.4th 518, 553-554 [no prosecutorial misconduct unless there is a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner].)

3.      *Cross-examination and Impeachment of Long*

Hardeman next claims that Terrell did not effectively impugn Long's credibility. He argues that a detective would have testified about Long's marijuana use the day of the shootings, and Jodee Garrett would have testified that Long had threatened Garrett to provide officers with certain statements.

We are satisfied based on our review of the record that there are logical tactical reasons why competent counsel would not call the detective, Garrett, and Garrett's mother as witnesses. At the first trial, the detective testified that Long's statements about the shooting incident while he was in the hospital were quite detailed (and the details were entirely consistent with Long's trial testimony), which would have enhanced Long's

18

credibility.[7]  As to Garrett, his testimony at the first trial was rambling and convoluted. He had told Detective Davenport at one point that he was present at the shootings and saw Hardeman with a gun on September 20, 2012—a statement he claimed at trial was actually a lie because Long and his family had told him to lie.  At the same time, Garrett denied ever lying to the detective, and had previously said that Long wanted him to tell the truth.  Ultimately, Garrett testified that he was home at the time of the shootings, never saw the shooter, and was not with Long, Anderson, or Hardeman.

Finally, had Terrell attempted further attacks on Long's credibility, the prosecution could have called additional witnesses to recount how fervently and consistently Long had described the night's events.  Hardeman has not demonstrated counsel's ineffectiveness for declining to call witnesses that would either enhance or make no impact on Long's credibility.

4.      *Cross-examination and Impeachment of Williams*

Hardeman argues that Terrell did not effectively impeach Williams on her inconsistency regarding the date she saw Hardeman with a gun in the loft of her house. To the contrary, Williams quite openly admitted on direct and cross-examination that she could not recall the date she saw Hardeman with a gun, and he had been to her house about five times in September 2012.  Assuming Williams previously gave detectives a slightly different range of dates or times that Hardeman had been to her house, such

---

7      Long's account of the shooting incident, including his immediate recognition of Hardeman, was also substantiated by Anderson.

19

evidence would not be materially inconsistent with her trial testimony.  Terrell's performance has not been shown to be deficient.

In summary, Hardeman has not set forth a prima facie case for relief based on ineffective assistance of counsel.  His appeal on the same ground fails as well.

DISPOSITION

The judgment is affirmed.  The petition for writ of habeas corpus is denied.

HALLER, Acting P. J.

WE CONCUR:

McDONALD, J.

O'ROURKE, J.