Filed 7/26/21  P. v. Yang CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C089921 |
| Plaintiff and Respondent, | (Super. Ct. No. 18FE011738) |
| v. | |
| FONG YANG, | |
| Defendant and Appellant. | |

Defendant Fong Yang was convicted of six counts of committing lewd and lascivious acts against a child under the age of 14 years old (Pen. Code, § 288, subd. (a))[1] and an enhancement allegation that he committed the offenses against more than one victim (§ 1203.066, subd. (a)(7)) was found true.  On appeal he contends:  (1) there was insufficient evidence to support the convictions because the victims' testimony was inherently improbable; (2) the trial court should have modified CALCRIM No. 1110 to

---

[1]  Undesignated statutory references are to the Penal Code.

clarify that it required proof beyond a reasonable doubt; and (3) his sentence violates the prohibition against cruel and unusual sentences. We affirm.

BACKGROUND

Defendant is K.D. and A.D.'s maternal grandfather. He is the patriarch of the family. Six of his 15 children live at his house. Defendant and his wife speak only Hmong. K.D. and A.D. speak only English. K.D. and A.D., and their two brothers, regularly went to their grandparents' home for daycare. In addition to K.D. and A.D. and their brothers, defendant's other children and grandchildren were regularly at defendant's home.

When K.D. was about seven years old, she went to daycare at her maternal grandparents' home. When K.D. was about nine years old, her parents separated. She, her mother, and her siblings lived with her maternal grandparents from that time until her mother was able to find an apartment, when K.D. was about 11. After they moved out, K.D., A.D., and their siblings continued to go to their maternal grandparents' home for daycare.

K.D. testified defendant began molesting her when she was 12 years old. The first time was during the summer, while her mother was at work. She was sitting in the living room watching television with her 12-year-old aunt, Jennifer, and 14-year-old uncle, Robert. Jennifer and Robert were on an adjacent couch, either watching television or on their cell phones and not paying attention. Defendant sat down next to her, put his arm under her armpit and massaged her breast from the side. He tried to put his hand under her shirt, but she stopped him. She said he massaged her breast for about two minutes. K.D. got up and went to the bathroom. She was panicked, scared, and cried. She did not say anything at the time because Jennifer and Robert were also there, and she did not want to cause a commotion. She was afraid to say anything to her other relatives because she did not think they would believe her because of defendant's position in the family.

2

K.D. testified defendant touched her again the next day and every time she was at his home. She said he usually touched the side of her breasts, but also touched her buttocks. She told him to stop about 5 to 10 times, but only when no one else was around. When she told him to stop, he hushed her. Each touching happened quickly, he squeezed her breast and then moved on. She felt the touching was sexual in nature because he was doing it privately and when other people were not paying attention. K.D. told her mother that she did not want to continue to go to her grandparents, but her mother said she did not have any other daycare options. She did not tell her mother why she did not want to go back to her grandparents' home.

Twice defendant touched K.D.'s buttocks. The first time, when she was 12 years old, she was laying down sleeping, and when she woke up he was leaning over her, touching her buttocks, rubbing in circles. No one else was in the room. She got up, left the room, and went downstairs to where her aunts were. The second time, when she was 13 years old, was at her mother's former apartment. Her mother was performing a cultural ceremony. Defendant put her between him and her mother, behind her mother. Then he briefly groped her buttocks. She did not speak up because she did not want to interfere with the ceremony and her grandmother was there.

One time when she was 13 years old, she was babysitting her baby cousin, and defendant offered a dollar to let him touch her breasts. Although that time, they were alone in the house, usually there were other people in the house with them. When those other people were there, they were usually using their phones or watching television. He usually touched her in the living room or upstairs in one of the bedrooms. She went to the bedroom to get away from defendant.

As she got older, she went to her grandparents' home less often. The last time defendant touched her was when she was 15 years old. She had been dismissed from school early because of a problem with her wisdom tooth. He tried to touch her and convince her to go outside. She told him "no," and pushed him away.

3

K.D. then saw defendant molest her younger sister, A.D. The first time, K.D. was 15 or 16 years old. She and A.D. were sitting next to each other playing with their phones. Their brothers Justin and Joseph were on the floor, Joseph sleeping and Justin playing with his phone. Defendant knelt against the sofa by A.D. K.D. saw A.D. looking uncomfortable and saw defendant's arm moving "in circles." She created a distraction and defendant left. Later that night, K.D. asked A.D. if defendant had touched her and A.D. confirmed he had. She cried and K.D. comforted her. The second time, K.D. was 16 years old, A.D. was sitting on the stairs and K.D. was on the couch. She looked up from her phone and saw defendant kneeling next to A.D. on the staircase. A.D. looked uncomfortable again. She saw defendant's arm moving and knew he was molesting A.D. again. She told A.D. to come to her and A.D. did. Defendant stood up and left. She talked to A.D. again, and A.D. again confirmed defendant was touching her. A.D. looked sad, and said she was uncomfortable.

A.D. testified defendant touched her and rubbed her breasts over her shirt. She remembered the touching starting when she was about nine years old and continuing until she saw him for the last time, when she was 12 years old. It did not happen every time she was there, but about once or twice a month. To try to stop it, she would walk away and try to sit next to someone else. She was afraid to say anything to defendant about it. There were generally people around when defendant touched her, but they were not paying attention; they were on their phones. He never touched her in front of people who were paying attention. The touching was very quick, each occasion usually 20 or 30 seconds.

On one particular occasion, A.D. had left school early because she was ill. She was sitting on the couch resting, and defendant started rubbing her stomach and then touched her breasts. It ended when her grandmother called for defendant. A.D. felt too scared to tell him to stop. She did not tell anyone about the touching because she did not think anyone would believe her. She also described a touching on the staircase of

4

defendant's home when she was about 11 years old. She had been sitting on the couch when defendant came over and sat very close to her, so she moved to the staircase. He followed her to the staircase, showed her a video on his phone, and touched her breasts. She did not say anything at that time because she was afraid and did not think people would believe her.

In 2015, her freshman year, K.D. had also told her boyfriend at the time, T.L., about the molestations. She told him defendant touched her every time she went to his home. Through the course of their relationship, she told T.L. whenever defendant touched her. She also told T.L. about the molestations of her sister. In November 2017, K.D.'s junior year, she told her cousin, who was also one of her best friends, about defendant touching her. K.D.'s cousin never saw anything happen and did not believe K.D. After K.D. told her cousin, their friendship fell apart. K.D. did not want T.L. or her cousin to tell anyone.

Initially, K.D. did not tell her mother because she did not want to cause more problems between her parents, including additional custody issues. She did not tell her father because they were adapting to having a renewed relationship. Eventually, around Thanksgiving 2017, K.D. told her mother about defendant touching her. She and A.D. started crying and her mother told them to stay away from grandfather and just tell him to stop.

In December 2017, T.L. ended up telling one of his teachers that defendant was touching K.D. T.L. also spoke with a police officer. A few days after T.L. reported the molestation, K.D. told her father and his fiancée about defendant touching her and A.D. A.D. and K.D. told them that defendant mostly touched their breasts.

Prior to trial, K.D. was interviewed by Sacramento Police Officer Morgan Becker. K.D. told Officer Becker defendant started touching her when she was 12 years old. He touched her breasts and sometimes told her to be quiet. She did not know how many

5

times he had touched her, but too many to count. Defendant touched her every day. Detective Sara Dorsey also interviewed K.D. and A.D.[2]

Other family members who were regularly at defendant's home, testified they had never seen defendant touch K.D. or A.D., had never seen any problems between defendant and the girls, and defendant had never touched them inappropriately. They did not believe K.D. and A.D.

As a result of these accusations, K.D. and A.D. were ostracized from their mother's side of the family. A.D. became nervous, depressed, and afraid. K.D. became very stressed and had to start counseling. The girls had to move into their father's home, which was crowded and cramped. That move also required K.D. to change high schools and start her senior year over.

## PROCEDURAL HISTORY

An information charged defendant with seven counts of committing a lewd and lascivious act on a child under the age of 14 (§ 288, subd. (a) – counts one through four as against K.D. & counts five through seven as against A.D.). The information also alleged the offenses were committed on more than one victim (§ 1203.066, subd. (a)(7)). The jury found defendant guilty of counts one through six, and found the multiple victim enhancement true. The jury was unable to reach a verdict on count seven. The trial court declared a mistrial on count seven and dismissed it.

The trial court sentenced defendant to an aggregate term of 13 years in state prison as follows: the low term of three years for count one, and consecutive two-year terms (one-third the midterm) for counts two through six. The court ordered defendant to pay various fines and fees, and issued no contact orders as to K.D. and A.D.

---

[2] These interviews were recorded. Portions of the transcripts and recordings of these interviews were viewed by the jury and the videos were admitted into evidence. Neither is included in our record on appeal.

DISCUSSION

I

*Substantial Evidence*

Defendant contends there was insufficient evidence to convict defendant. Defendant also argues that both girls lied about material facts, such that all of their testimony should have been disregarded. Specifically, he contends that K.D.'s testimony was "improbable and beyond belief" in that she testified defendant touched her "in front of others," and there were inconsistencies in her accounts to her father and his fiancée as compared with her trial testimony. As to A.D., defendant contends her testimony was "[s]imply unbelievable" as she testified he would touch her when other people were present.[3] He argues in "stark contrast" to their testimony "witness after witness testified as to [defendant's] good character and that he would have never molested" anyone.

Where the sufficiency of evidence is challenged on appeal, we review the record in the light most favorable to the judgment to determine whether it discloses substantial evidence. (*People v. Snow* (2003) 30 Cal.4th 43, 66.) Substantial evidence is evidence that is "reasonable, credible and of solid value -- from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Ibid*.) We draw all inferences from the evidence that supports the jury's verdict. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1382.) "We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 638.) "By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence. The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations." (*People v. Falsetta* (1999) 21 Cal.4th 903, 915.) " 'Resolution of

---

[3] Defendant does not make a specific claim as to testimony from A.D. in which she lied about material facts.

7

conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.]  Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' " (*People v. Brown* (2014) 59 Cal.4th 86, 106.)  Before the judgment can be set aside for insufficient evidence, "it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the jury." (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429.)

Section 288, subdivision (a) has two elements:  (1) the touching of an underage child's body (2) with a sexual intent.  (*People v. Martinez* (1995) 11 Cal.4th 434, 444-445.)  The character of the touching may be circumstantially relevant to prove intent, but is otherwise immaterial.  (*Id.* at p. 452.)  Even an "innocuous" touching, "innocently and warmly received," violates section 288, subdivision (a), if effected with lewd intent. (*People v. Lopez* (1998) 19 Cal.4th 282, 289-290.)

Defendant does not claim that, if believed, K.D. and A.D.'s testimony did not satisfy the elements of the offenses charged.  Rather, he argues their testimony was inherently improbable.  But " ' "[t]o warrant the rejection of the statements given by a witness who has been believed by the [trier of fact], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.  [Citations.]  Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]" ' " (*People v. Barnes* (1986) 42 Cal.3d 284, 306, quoting *People v. Thornton* (1974) 11 Cal.3d 738, 754; accord, *DiQuisto v. County of Santa Clara* (2010) 181 Cal.App.4th 236, 261.) Except in rare instances of demonstrable falsity, doubts about the credibility of the in-court witness should be left for the factfinder's resolution.  (*People v. Cudjo* (1993) 6 Cal.4th 585, 609.)  Testimony may be rejected as inherently improbable or incredible

only when the testimony is unbelievable per se, physically impossible, or wholly unacceptable to reasonable minds. (*Oldham v. Kizer* (1991) 235 Cal.App.3d 1046, 1065.) That is not the case here.

K.D. and A.D. each testified that when they were between the ages of 9 and 12 years old, defendant repeatedly touched them on their breasts. K.D. also testified defendant groped her buttocks. Defendant touched them when they were either alone with him or when those present were otherwise occupied, distracted, and not paying attention to them. The touchings were completed quickly, within seconds. The girls were uncomfortable and felt the touchings were sexual and inappropriate. Years before these proceedings, and contemporaneous with some of the conduct, K.D. told her then boyfriend that defendant was touching her and A.D. Neither K.D. nor A.D. told family members about the molestations because they feared they would not be believed, a concern which turned out to be well-founded. Although the house was busy and others were regularly present, it is not impossible or even inherently improbable that defendant could surreptitiously touch the girls while others were distracted or otherwise occupied. This is particularly true as many of the others present in the home were children themselves, watching television or on their cell phones. In addition, the incidents of touching were quick.

Defendant's claim that the girls testified falsely about material facts is similarly an attack on the credibility of the witnesses' testimony. As we have said, such determinations are the exclusive province of the jury. The jury was instructed to consider the effect of inconsistencies or conflicts in testimony. It was also instructed if it determined a witness lied, it should consider the believability of the entirety of that witness's testimony. (CALCRIM No. 226.) The jury heard the evidence casting doubt on the credibility of the victims' testimony. Defense counsel cross-examined the witnesses about their recollection of the touchings and the surrounding circumstances, and the discrepancies and inconsistencies in their statements. And, defense counsel

9

argued those points extensively in closing argument. "The final determination as to the weight of the evidence [was] for the jury to make." (*People v. Brown, supra*, 59 Cal.4th at p. 106.) That defendant believes the victims' credibility was undermined by false or inconsistent statements does not undermine the testimony as substantial evidence sufficient to support the judgment. Because the jury reasonably could have concluded from the totality of the evidence presented that defendant touched the girls with a sexual intent, substantial evidence supported his convictions.

II

*Jury Instruction*

Defendant contends the instructions given "violated [his] constitutional right to be acquitted unless the prosecution proved him guilty beyond a reasonable doubt." He claims the fact that the instructions given included a specific instruction that the jury find the multiple victim allegation "beyond a reasonable doubt," but such language was not also specifically included in the lewd and lascivious conduct charges confused the jury because it would have led the jury to believe only the multiple victim allegation required proof beyond a reasonable doubt, not the lewd and lascivious conduct charges. He argues the trial court should have added language to the instruction on section 288, subdivision (a), that the jury could only convict defendant if the prosecution had proven this allegation beyond a reasonable doubt.

*Relevant Background*

The trial court instructed the jury the prosecution was required to prove their case beyond a reasonable doubt, and that whenever the court said the People "must prove something, I mean they must prove it beyond a reasonable doubt." [4] The trial court also

---

[4] The trial court instructed with CALCRIM No. 220, which provides in full: "A [d]efendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the

10

provided specific instructions as to the elements of violating section 288, subdivision (a), which informed the jury "the People must prove that, one, the [d]efendant willfully touched any part of a child's body either on the bare skin or through the clothing; two, the [d]efendant committed the act with the intent of arousing, appealing to or gratifying the lust, passions or sexual desires of himself or the child; and three, the child was under the age of 14 years at the time of the act."[5]

The court went on to instruct the jury if it found defendant guilty of at least one of the crimes charged in counts one through four and one of the crimes charged in counts five through seven, it "must then decide whether the People have proved the additional allegation that those crimes were committed against more than one victim in violation of section 1203.066[ subdivision ](a)(7)." "The People have the burden of proving this

---

People must prove something, I mean they must prove it beyond a reasonable doubt. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. [¶] Unless the evidence proves the [d]efendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."

[5] The trial court instructed with CALCRIM No. 1110, which provides in full: "The [d]efendant is charged in Counts 1 through 7 with committing a lewd or lascivious act on a child under the age of 14 years in violation of Penal Code section 288[ subdivision ](a). [¶] To prove that the [d]efendant is guilty of this crime, the People must prove that, one, the defendant willfully touched any part of a child's body either on the bare skin or through the clothing; two, the [d]efendant committed the act with the intent of arousing, appealing to or gratifying the lust, passions or sexual desires of himself or the child; and three, the child was under the age of 14 years at the time of the act. [¶] Someone commits an act willfully when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else or gain any advantage. Actually arousing, appealing to or gratifying the lust, passions or sexual desires of the perpetrator or the child is not required."

11

allegation beyond a reasonable doubt.  If the People have not met this burden, you must find that this allegation has not been proved."  (CALCRIM No. 3181.)

Prior to giving the instructions, the parties discussed the instructions to be given. Both CALCRIM Nos. 1110 and 3181 were discussed.  The trial court confirmed there were no objections to any instructions to be given, no instruction requested by a party had been refused, and both parties agreed to all modifications.  During their closing arguments, the prosecutor and defense attorney each argued the prosecution was required to prove defendant guilty beyond a reasonable doubt.

*Analysis*

The People contend defendant has forfeited this issue by failing to object to the challenged instructions at trial.  We agree.

"In general, a defendant may raise for the first time on appeal instructional error affecting his or her substantial rights.  (Pen. Code, § 1259; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 103, fn. 34.)  But '[a] party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial.'  (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503.)"  (*People v. Buenrostro* (2018) 6 Cal.5th 367, 428.)  Defendant's claim here is that CALCRIM No. 1110 improperly permitted the jury to find him guilty based on less than evidence beyond a reasonable doubt and therefore, required clarification.  "At bottom, it is an argument that the instruction was incomplete."  (*Buenrostro,* at p. 428.) As such, defendant was obligated to request a clarifying instruction.  (*Ibid.*)  Because defendant did not object at trial that the instructions were incomplete as given, the issue is forfeited.  Moreover, on the merits, there was no instructional error.

We review a claim of instructional error de novo.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1210.)  "On review, we examine the jury instructions as a whole, in light of the trial record, to determine whether it is reasonably likely the jury understood the challenged instruction in a way that undermined the presumption of innocence or

12

tended to relieve the prosecution of the burden to prove defendant's guilt beyond a reasonable doubt. [Citation.]" (*People v. Paysinger* (2009) 174 Cal.App.4th 26, 30.) An instruction can only be found to be ambiguous or misleading if, in the context of the entire charge, there is a reasonable likelihood that the jury misconstrued or misapplied its words. (*People v. Frye* (1998) 18 Cal.4th 894, 957.) "Defendant appears to suggest that the jury, even though properly instructed, might still have been confused about the requisite standard of proof. We reject that argument." (*People v. Carey* (2007) 41 Cal.4th 109, 130.) Instead, we presume jurors are intelligent people capable of understanding and correlating all jury instructions and applying them to the facts of the case. (*Ibid.*; *People v. Campbell* (2020) 51 Cal.App.5th 463, 493.)

The instructions given informed the jury that the prosecution was required to prove each element of section 288, subdivision (a), and every matter the prosecution was required to prove had to be proven beyond a reasonable doubt. The court then instructed on the enhancement allegation, and instructed that just like the substantive offenses, this allegation had to be proven beyond a reasonable doubt. There were no instructions providing any other burden of proof or suggesting the jury should apply any lower standard of proof to any issue. The parties also argued the prosecution was required to prove defendant's guilt on the sexual molestation charges beyond a reasonable doubt. Considering the instructions and record as a whole, there is no reasonable likelihood the jury would have misapplied or misconstrued these instructions. (See *People v. Van Winkle* (1999) 75 Cal.App.4th 133, 147-148.)

III

*Cruel and Unusual Punishment*

Defendant contends his sentence of 13 years constitutes cruel and unusual punishment. He claims the sentence is disproportionate to his offense because he was 64 years old at the time of the sentence, he is a military veteran, he had no prior criminal

record, the charged offenses were rubbing the breasts of his victims over their clothes, and his conviction offense does not pose a danger to society at large.

*Relevant Background*

The probation report recommended a sentence of 16 years, consisting of the midterm of six years on count one, and five consecutive two-year terms (one-third the midterm) on counts two through six. Defendant filed a motion objecting to the "indicated" sentence on the grounds it would constitute cruel and unusual punishment. He argued the mandatory minimum sentence of three years for section 288, subdivision (a), and the enhancement allegation penalties for section 1203.066, subdivision (a)(7) of 15 years, 15 years to life, and probation ineligibility were grossly disproportionate to defendant and his offenses.

At the sentencing hearing, the trial court noted that the minimum penalty was in fact 13 years, not 15.[6] The court explained this was not a life sentence case, the facts of the case were not exceptional, and denial of probation for felony child molestation was not disproportionate to the crime. The trial court concluded the punishment was not cruel and unusual.

After the court concluded the sentence was not cruel and unusual punishment, defense counsel argued that the midterm sentence recommended by probation was not justified, but that using the low term would be more appropriate. The trial court indicated that it intended to impose the low term.

---

[6] The People argue this claim is forfeited as defendant objected only to the imposition of a term of 15 years or 15 years to life as being cruel and unusual punishment, and made no argument that the sentence of 13 years was cruel and unusual punishment. The record is not entirely clear, but it appears that the trial court considered the issue of cruel and unusual punishment based on its intention to impose a 13-year sentence. Accordingly, we will not find forfeiture on this ground.

14

*Analysis*

"The Eighth Amendment contains a ' "narrow proportionality principle" that "applies to noncapital sentences." ' " (*Ewing v. California* (2003) 538 U.S. 11, 20 [155 L.Ed.2d 108].) The Eighth Amendment 'forbids only extreme sentences that are "grossly disproportionate" to the crime.' (*Harmelin v. Michigan* (1991) 501 U.S. 957, 1001 [115 L.Ed.2d 836] (conc. opn. of Kennedy, J.) (*Harmelin*).) Reviewing courts must ' "grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes." ' (*Id*. at p. 999 (conc. opn. of Kennedy, J.), quoting *Solem v. Helm* (1983) 463 U.S. 277, 290 [77 L.Ed.2d 637].)" (*People v. Edwards* (2019) 34 Cal.App.5th 183, 190-191.)

Our deference is especially pronounced with sentences specified by the Legislature for sexual abuse of children. On this point, the United States Supreme Court has noted that "[t]he sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people." (*Ashcroft v. Free Speech Coalition* (2002) 535 U.S. 234, 244 [152 L.Ed.2d 403].)

The California Constitution provides that "[c]ruel or unusual punishment may not be inflicted or excessive fines imposed." (Cal. Const., art. I, § 17.) A prison sentence violates this prohibition on cruel and usal punishment "if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424, fn. omitted.) "The main technique of analysis under California law is to consider the nature both of the offense and of the offender. (*People v. Dillon* (1983) 34 Cal.3d 441, 479.) The nature of the offense is viewed both in the abstract and in the totality of circumstances surrounding its actual commission. The nature of the offender focuses on the particular person before the court, the inquiry being whether the punishment is grossly disproportionate to the defendant's individual culpability, as shown by such factors as age, prior criminality, personal characteristics, and state of mind. ([*Id.*]

at p. 479; *People v. Weddle* [(1991)] 1 Cal.App.4th [1190,] 1197-1198 & fn. 8.)" (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494.)

A lengthy sentence by itself does not establish cruel and unusual punishment. California's "appellate courts have held that lengthy sentences for multiple sex crimes do not constitute cruel or unusual punishment." (*People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 531 [affirming sentence of 129 years for multiple offenses committed against defendant's stepdaughter].) This court upheld a sentence of 135 years to life for multiple counts of child sexual abuse in *People v. Retanan* (2007) 154 Cal.App.4th 1219. In rejecting a challenge to the sentence as cruel and unusual punishment, this court recognized that "the sentence imposed is substantially longer than [defendant's] possible lifespan." (*Id*. at p. 1230.)

Defendant's sentence was constructed from six separate felonies and consisted of the low term on the principal offense, and one-third the midterm on the five subordinate offenses. Defendant was the head of the family. He was entrusted to care for K.D. and A.D. Over the course of a number of years, he committed these sex offenses against his granddaughters who were between 9 and 15 years old when he repeatedly molested them. When his victims tried to stop him, he shushed them. They felt helpless to report the molestation because they feared they would not be believed, because of his position in the family. Defendant held a position of both authority and trust.

In view of defendant's crimes, the vulnerability of his victims, and his pattern of molestations involving two victims, defendant's sentence did not violate the California Constitution's prohibition against cruel or unusual punishment.

Nor is his probation ineligibility cruel and unusual. "Probation is a privilege and not a right. [Citation.] Denial of probation does not constitute cruel or unusual punishment. [Citation.] A mandatory prison sentence for felony child molest is not 'so disproportionate to the crime for which it is inflicted that it shocks the conscience and

16

offends fundamental notions of human dignity.'  [Citation.]"  (*People v. Thompson* (1988) 205 Cal.App.3d 871, 884.)

DISPOSITION

The judgment is affirmed.

/s/                           
<br>HOCH, J.

We concur:

/s/                                  

BLEASE, Acting P. J.

/s/                                  

MAURO, J.